**Karen CHRISTY and Christy Newsreel Services, Inc., Plaintiffs,**

**v.**

**Michael SERVITTO, George O. Bruggeman and The City of Warren, Defendants.**

Civ. A. No. 83–5418 PH.

United States District Court, E.D. Michigan, S.D.

Oct. 24, 1988.

Franklin Richard Brussow, Brussow & Krause, Lansing, Mich., for plaintiffs.

Janice Hildenbrand, Ulanoff, Ross & Wesley, Southfield, Mich., Matthew A. Seward, Detroit, Mich., Walter A. Jakubowski, Dave Dalenberg, City Atty.'s Office, Warren, Mich., for defendants.

## MEMORANDUM OPINION AND ORDER

JAMES HARVEY, District Judge.

Nearly three years ago, this Court, in *15192 Thirteen Mile Road Inc. v. City of Warren*, 626 F.Supp. 803 (E.D.Mich.1985), was called upon to review various constitutional challenges to section 14.02 of the Warren zoning ordinance. Section 14.02 regulated the ability of adult businesses to locate within the City of Warren. The plaintiffs, five different corporations whose principals proposed to open adult businesses in Warren, attacked the ordinance as void for vagueness, overbroad, and deficient under *United States v. O'Brien*, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968). After conducting two hearings for preliminary injunctions and having taken testimony for nearly four weeks, the Court upheld the portion of section 14.02 prohibiting an adult business from locating within 500 feet of a residential use, an area zoned residential, and from within 1000 feet of a church or school. The Court struck down as unconstitutionally vague, however, the site plan review procedure and procedure for special land use approval because they vested an improper degree of discretion in the reviewing officials.

While *15192 Thirteen Mile Road* was still pending, Karen Christy, one of the principals in *15192 Thirteen Mile Road*, and Christy Newsreel Services, Inc. brought this action alleging that defendants precluded them from using the building located at 5583 East Eight Mile to open a retail video sales and service store in violation of the first, fifth and fourteenth amendments to the United States Constitution. The Court refused to consolidate this action with *15192 Thirteen Mile Road* because this case raised difficult questions concerning the application of section 14.02 and other city regulations not present in the other actions consolidated under *15192 Thirteen Mile Road*.

The Court held 46 days of trial in this matter and admitted approximately 200 exhibits. Having reserved its ruling on defendants' motion at trial for an involuntary dismissal pursuant to Rule 41(b), the Court hereby issues its Findings of Fact and Conclusions of Law in accordance with Rule 52(a).

## I. FINDINGS OF FACT

### A. *Introduction*

(1) Karen Christy is the sole shareholder of Christy Newsreel Services, Inc. (News-

reel Services), a Michigan corporation formed on November 1, 1982. Christy, through Newsreel Services, presently operates three adult entertainment businesses: the "Velvet Touch, Video and Gift Boutique," in Lansing, "Unique Creations," in Ypsilanti, and the "Velvet Touch, Video and Gift Boutique," located on I–69 and referred to at trial as the "Charlotte store." She also is attempting to open two other stores in the Lansing area. Newsreel Services presently employs approximately 20–30 people.

(2) Christy resides with and has had a social and business relationship with Whitman since 1978; Whitman also is engaged in the operation of several adult oriented businesses throughout the state.. Whitman presently operates five such stores through Executive Art, Inc.; one each in Lansing, Kalamazoo, Wyoming, Mt. Morris and Warren.[1] Whitman also operates a store in Parma and a store in Flint through a separate corporation, Fashion Design. The sign above each of Whitman's stores reads "Velvet Touch."

(3) Michael Servitto was appointed Director of the City of Warren's Department of Public Service in November 1981, by Mayor–Elect James Randlett, and served in that position until Randlett was defeated in the mayoral election in November 1985.

As Director of the Department of Public Service, Servitto supervised eight divisions: Building and Safety Engineering, Water, Department of Public Works, Service, Sanitation, Engineering, Sewage and Treatment, and Building Maintenance. Servitto testified that work associated with the Water Division and Department of Public Works consumed the majority of his time.

(4) George O. Bruggeman is Superintendent of the Division of Buildings and Safety Engineering (building department), one of the eight divisions within the Department of Public Service. The building department contains five separate bureaus: Electrical, Building, Plumbing, Heating/Cooling and Zoning. Each bureau employs one or more inspectors who are charged with the responsibility of implementing the City's ordinances and adopted trade codes which regulate the occupancy of buildings located in the City of Warren.

(5) On December 12, 1978, the Warren City Council adopted by reference, with certain modifications, the Basic Building Code, 1978 Edition, published by the Building Officials and Code Administrators Information, Inc. (BOCA). The BOCA Basic Building Code went into effect on January 1, 1979. The 1981 BOCA Basic Building Code was adopted by reference, again with certain modifications, by the City Council, effective June 13, 1983. Prior to January 1, 1979, the building department applied the Warren Building Code.

The electrical inspectors apply the Warren Electrical Ordinance, the National Electrical Code (N.E.C.) and the Uniform Reciprocal Rules (adopted by the Uniform Reciprocal Council of Southeast Michigan Communities). The zoning inspectors apply the Warren zoning ordinance.

(6) Also within the building department but independent from the other five bureaus is the position of City Plan Examiner. The Plan Examiner reviews building permit applications and any accompanying plans to ensure the application and plans conform to the applicable code provisions.

(7) Under section 119.2 of both the 1978 and 1981 edition of the BOCA Basic Building Code (BOCA Code), an owner is required to obtain a "certificate of use and occupancy," whenever an existing building is "enlarged, extended or altered to change from one use to another or to a different use within the same use group in whole or in part,...." A certificate of use and occupancy for an existing building is referred to in the City of Warren as a certificate of reoccupancy or as a certificate of occupancy for reoccupancy. "Use group" is defined in section 201.3 as the "classification of a building or structure based on the purpose for which it is used." Section 202.1 establishes nine use groups: (1) Group A: assembly; (2) Group B: business; (3) Group F: factory and industrial; (4) Group H: high hazard; (5) Group I:

1. The store presently operated in Warren is located at 22640 Van Dyke Avenue.

institutional; (6) Group M: merchantile; (7) Group R: residential; (8) Group S: storage; and (9) Group T: temporary and miscellaneous. "Use" is defined in section 201.3 as "The purpose for which the building or structure is designed, used or intended to be used."

(8) In order to obtain a certificate of occupancy, an owner of a building or his agent must first obtain a "special permit" requesting reoccupancy inspections. Once the special permit is secured, a date is established in which the owner or agent agrees to be on the premises during a specific period of time for the inspections. Once the inspections are completed, the owner or agent is then apprised of any outstanding violations either by phone or mail by each of the inspectors. Depending on the nature of the violation, the owner or agent may need to obtain a permit from the particular bureau to remedy the violation. It is not uncommon for a building to require several inspections before all the violations are remedied. Once all the violations are corrected and each inspector has issued his approval, a certificate of occupancy is issued.

(9) The determination of whether a building permit is necessary to do certain work, regardless of whether the planned work is to remedy violations resulting from a request for a reoccupancy inspection or simply to remodel the premises, is governed by section 112.1 of the BOCA Code:

**112.1 When permit is required:** It shall be unlawful to construct, enlarge, alter or demolish a structure; or change the occupancy of a building or structure requiring greater strength, exitway or sanitary provisions; or to change to another use; or to install or alter any equipment for which provision is made or the installation of which is regulated by this code, without first filing an application with the building official in writing and obtaining the required permit therefor; except that ordinary repairs, as defined in Section 102.0, which do not involve any violation of this code shall be exempt from this provision.

Section 102.1 pertaining to ordinary repairs states in relevant part:

**102.1 General:** Ordinary repairs to structures may be made without application or notice to the building official; but such repairs shall not include the cutting away of any wall, partition or portion thereof, the removal or cutting of any structural beam or bearing support, or the removal or change of any required means of egress, or rearrangement of parts of a structure affecting the exitway requirements;....

Applications for a building permit are provided at the building department. In filling out an application, section 112.4 provides:

**112.4 Description of work:** The application shall contain a general description of the proposed work, its location, the use and occupancy of all parts of the building or structure and of all portions of the site or lot not covered by the building or structure, and such additional information as may be required by the building official.

Section 112.5 requires the submission of specifications and plans along with the permit applications:

**112.5 Plans and specifications:** The application for the permit shall be accompanied by not less than two (2) copies of specifications and of plans drawn to scale, with sufficient clarity and detail dimensions to show the nature and character of the work to be performed.... The building official may waive the requirement for filing plans when the work involved is of a minor nature.

Although section 112.5 indicates that only two copies of plans need be submitted when required, building permit applications request that four copies be supplied. If the projected cost of the work to be done does not exceed $5,000.00, the Plan Examiner has discretion to accept a sketch in lieu of an architectual drawing.

Once the application is filled out, a clerk at the counter takes the application and assesses the permit fee and determines the amount of the bond to be posted. If necessary, a plan fee is also charged. The Clerk

then routes the application and any accompanying plans to the inspectors and Plan Examiner for their approval. The time necessary to process the application is a function of the complexity of the proposed construction and the time of year. Spring and summer are especially busy; an increased number of applications are filed during those months. Approval or rejection of an application may take anywhere from several hours to several weeks.

Once the application is approved, a permit is granted. When the work is completed, the owner or agent contacts the building department and requests an inspection. If the work is "up to code," the inspector issues his approval.

(10) With respect to obtaining an electrical permit, section 6–226(a) of the Warren Electrical Ordinance states:

> It shall be unlawful in the city for any person to install, alter, maintain, service or repair electrical equipment in or on any building, structure or part thereof, or on premises, or cause or permit therein or thereon the installation, altering, maintaining, servicing or repairing of any electrical equipment, without a permit having been obtained therefor as provided herein.

Subsection (b) excepts minor repair work from the need to obtain a permit:

> No permit will be required for minor repair work, such as the replacement of lamps or the connection of portable electrical equipment to suitable permanently installed receptacles. Nothing in this section shall be considered as applying to any person engaged in repairing and maintaining electrical appliances.

Section 6–238(13) requires a detailed set of plans and specifications to be submitted "for any wiring or alterations to the electrical system in all buildings using over six circuits...." Section 6–238(13) further states that "electrical drawings shall include such details as lighting layout, circuiting switching, conductor and raceway sizes, wattage schedule, service location and riser diagram, calculations and proposed method of construction drawn with symbols of a standard form."

(11) Any decision pertaining to the application of the BOCA Code may, pursuant to section 126 of the BOCA Code, (as modified by the Warren ordinances), be appealed to the Building Code Board of Appeals. The Board of Appeals then forwards their recommendation to the City Council. Decisions by electrical officials may be appealed by filing a petition with the Board of Electrical examiners. Warren Electrical Ordinance, Section 6–221(c). The Board must rule on the petition within three days of its receipt. Similarly, a zoning decision may be appealed to the Zoning Board of Appeals which has the authority to reverse, modify or affirm the original decision. City of Warren Zoning Ordinance No. 30, Article XX, Section 20.04.

**B.  *22640–44 Van Dyke Avenue***

(12) The dispute over the use of the building located at 5583 East Eight Mile (5583) was preceded by a confrontation between Whitman and officials from the building department over the use of the buildings at 22640 and 22644 Van Dyke Avenue (22640; 22644) owned by Whitman.

(13) Whitman testified that sometime in March or April of 1977, he obtained a copy of the Warren zoning ordinance and found nothing which would preclude him from opening his adult businesses in Warren. Whitman testified that although he did not know what he would use 22644 for when he first bought it, he later decided to sell adult books; with respect to 22640, he planned to offer nude models for photographing and body painting. He also planned to offer the "Velvet Touch," a technique he invented and describes as a "light fingertip caress of the skin." He stated that he purposely omitted telling the building department of his true intention to sell adult books at 22644 and offer nude models for photographing and body painting, as well as the "Velvet Touch" at 22640 for fear the City would amend its zoning ordinance before he could obtain certificates of occupancy. Whitman conceded that he used a series of corporations and assumed names to "sneak up" on the City of Warren. He acknowledge that he has employed this clandestine approach of using assumed

names in other cities in order to establish adult oriented businesses in those cities. He also stated that the "Velvet Touch" was devised as a means of avoiding regulations existing in many cities restricting the location of massage parlors.

(14) The confrontation between the City and Whitman engendered by Whitman's attempt to sneak up on the City is chronicled in the building department file.

(15) On June 20, 1977, Michigan Diversified Properties, through "Tom Johnson," applied for a special permit for a reoccupancy inspection at 22644 for use as a retail record and tape store. A certificate of reoccupancy was issued on July 14, 1977. Although Whitman didn't recall using the name Tom Johnson, Michigan Diversified Properties, Inc. was an assumed name for Michigan Diversified Business Corp., a corporation owned by Whitman.

(16) The reoccupancy inspection request submitted June 20, 1977, was also utilized for inspections of 22640, and on July 28, 1977, a certificate of reoccupancy was issued to S.M.R. Corporation. S.M.R. was a corporation formed by Whitman.

(17) On August 12, 1977, applications for sign permits were filed for both locations. Sign plans were submitted indicating "Mel-O-Dee Records" would be displayed at 22644 and "Michigan Diversified Corporation" would be displayed at 22640.[2]

(18) Despite Whitman's attempt to open his store before an unfavorable ordinance was adopted, the City Council, still unaware of Whitman's intent regarding the use of 22640, adopted ordinance No. 30-545, on September 27, 1977, requiring health spas, massage parlors and establishments offering baths of any kind to obtain special use approval from the Planning Commission before a certificate of occupancy could be obtained. Other businesses requiring approval by the Planning Commission included reducing salons and

sports facilities of any type. *See 15192 Thirteen Mile Road v. City of Warren*, 626 F.Supp. 803, 822 (E.D.Mich.1985), for a discussion of the history of the Warren zoning ordinance.

(19) On November 30, 1977, Gordon Studios, through "Michael Gordon," applied for a certificate for reoccupancy for the premises at 22640, indicating the proposed use as "portrait painting." The special permit issued December 1, 1977, indicated "artist studio and office." A certificate of reoccupancy was issued on February 23, 1978. Gordon Studios was an assumed name of S.M.R., and Whitman testified that *he* was Michael Gordon. Whitman testified that he never intended to use 22640 as a portrait painting studio.

(20) On March 14, 1978, Detective Gary Maurer of the Warren Police Department visited the premises at 22640-44 Van Dyke pursuant to a complaint that a massage parlor was opening for business.[3] Detective Maurer's report indicated that the premises was locked. His report further indicated that on the following day he checked both the state and local assumed names divisions for Michigan Diversified Properties, Inc. and Michael Gordon or Gordon Studios, but found nothing filed under those names. (He was unable to locate the filing of the assumed names since none of them were filed with the Michigan Department of Commerce until April 20, 1978, over a month after Maurer's search.) This information was relayed to Bruggeman later that day.

(21) Acting pursuant to the complaint, Bruggeman, along with Assistant Director of the building department Pat Sankuer, gained entrance to the buildings at 22640-44 Van Dyke on March 16, 1978. Bruggeman and Sankuer testified that they noticed 12 three-foot wide booths which were open in the front in 22644. They further testified that a raised platform had been

---

**2.** Article 14 of the BOCA Code governs the construction, alteration, repair and maintenance of all signs. It does not regulate the face of the sign. Sign faces for 22640 and 22644 were submitted, however, along with the sign specifications.

**3.** Bruggeman testified that the Police Department often assists the building department in monitoring the use of buildings in Warren for violations of the BOCA Code, especially during nonbusiness hours when no one is on duty at the building department.

built which Sankuer indicated was approximately 36" high, and Bruggeman indicated was covered with red shag carpet. Bruggeman also observed a shower in one of the side rooms, and a showcase filled with retail tapes.

(22) Bruggeman and Sankuer immediately posted "no occupancy" stickers on both addresses. The following day someone removed the stickers. They were replaced by building inspector James Zimmerman. The stickers were either removed or painted over several more times during the next several weeks. New stickers were repeatedly posted. Whitman testified that it was he who had removed and painted over the stickers.

(23) On April 6, 1978, Bruggeman notified the building department clerks that the two sign permits reading "Mel–O–Dee Records" at 22644 and "Michigan Diversified Corp." at 22640 were not to be issued under any circumstances.

(24) On April 7, 1978, Bruggeman sent a letter to Servitto's predecessor, Public Service Director Paul Van Den Branden, updating him on the activity at 22640–44. In that letter, Bruggeman also stated that following his inspection of the two locations, he was contacted by attorney Howard Siecrist who indicated he represented Michael Gordon, the owner of Gordon Studios. Bruggeman reported the following conversation with Siecrist to Van Den Branden:

> In the conversation with this attorney I requested that Mr. Gordon come into the office in order that we could consult with him as to what the intended use of the two buildings would be. Mr. Siecrist indicated he had no intentions of sending Mr. Gordon into the Building Division and further indicated he had a certificate of occupancy by our Division and he was going to open up the places for business.

Bruggeman concluded the latter with the following paragraph:

> In summary, it appears that both of these commercial buildings have already started some illegal use and are doing it under close scrutiny so as to avoid both our Divisional personnel and the Warren

Police Department. This writer personally made daily trips to Mel–O–Dee Records only to find it locked during the day with notices from the gas and electric companies hung on the door handle. The back door of Mel–O–Dee Records, 22644 Van Dyke Avenue, is now sprayed with black paint, making it impossible to see into the building. The one door on the front which is of heavy steel construction has a lock and is only opened by the owner. All entry into the building must be through the back door.

(25) On April 13, 1978, two Warren police officers attempted to gain entry at the Van Dyke locations. They stated in their report:

> [We] checked the front and rear doors and found them to be locked. As we were knocking on the backdoor we heard the phone ring. The phone was answered by someone inside and we heard the subject tell the caller that the police were at the door. The subject then came and unlocked the door. As we walked inside the subject went back to the phone and told the caller that we were inside. As we walked past the counter the subject told us it would cost us 50¢ to enter the business. We advised the subject that we were there to make out a business card and he relayed this info to the caller. The subject was asked who owned the business and he stated that he didn't know. The subject was asked for his name and he related all the questions to the caller before he would answer. He was asked who he was talking to and he stated that he was talking to his attorney Howard Siecrist. At this time Siecrist must have told the subject to cooperate, he I.D. [sic] himself as Darth Weigum W/M1–20–52. We left a business card with him and he stated that he would give it to the owner to have it filled out and we advised that we would return on 4-14-78 to pick it up. Officers asked Weigum the type of business and stated that it was an adult book store. Officers viewed books in racks along the walls, they also had stag films in a case by the rear door. Apparently the rear door is to

be used as the main entrance. There were 12 viewing booths along the front of the store to be used for peep shows. The southeast corner of the building is sectioned off and vacant.

(26) In a memorandum from Sankuer to Bruggeman dated April 13, 1978, Sankuer indicated that at 9:30 p.m., April 12, 1978, the Van Dyke buildings were locked up and the No Occupancy stickers were still posted. He also indicated that Detective Maurer had called him and told him that he talked to two white males and a white female leaving the building earlier in the day (April 13, 1978). One of the males identified himself as an attorney and the girl as "flashy trashy"; he also indicated that the businesses would open at noon that day.

(27) The business at 22644 opened on April 13, 1978, and shortly thereafter, a sign reading "Danish Adult News" was placed over the store. Danish Adult News was an assumed name of Michigan Diversified Business Corp. The premises at 22640 remained vacant in April.

(28) On April 17, 1978, the City of Warren filed suit in Macomb County Circuit Court seeking injunctive relief on the ground that both Van Dyke locations were being occupied without a valid certificate of occupancy contrary to the zoning ordinance and thus were a nuisance *per se* under Mich.Comp.Laws Ann. § 125.587 (West 1986). After conducting a hearing on May 1, 1978, Judge Denewith found that the certificate of reoccupancy previously issued for the premises at 22644 was issued for use as a retail store and that the present use by defendants for retail sales and peep shows was in contravention of the use for which the certificate of reoccupancy was issued. The Court granted a temporary injunction which enjoined the use and occupancy of the premises at 22644 Van Dyke until the City could conduct its inspection. On May 2, 1978, the premises was inspected by the City inspectors and on May 3, 1978, the second hearing was conducted. Based on the testimony of the inspectors, the Court modified its May 1, 1978, order and lifted the injunction as to retail sales but continued the injunction as to the use of the peep show booths.

(29) Shortly after the amended injunction pertaining to 22644 was entered, 22640 opened for business offering nude body painting. Whitman testified that patrons painted such things as faces and lines on nude or partially nude models. The shower was used by both the patrons before touching the models and by models to wash the paint off after the session was over.

(30) On May 9, 1978, the Warren City Council passed ordinance No. 30–545, amending its zoning ordinance to add what is defined as "adult designated uses" to the list of other uses which required special use approval before a certificate of occupancy could be issued. Following the passage of ordinance No. 30–545, section 14.02 of the zoning ordinance stated:

Section 14.02—USES PERMISSIBLE ON SPECIAL APPROVAL. Under such conditions as the Planning Commission, after hearing, finds the use not being injurious to the C–2 District and surrounding area and not contrary to the spirit and purpose of this Ordinance subject further to the review by the Board of Appeals and approval, thereof, the following uses may be permitted.

1. Open air business uses when developed in planned relationship with the C–2 District as follows: Retail sales of plan materials not grown on site and sales of lawn furniture, playground equipment, and other home garden supplies.

2. Adult bookstores, adult motion pictures, and adult mini motion picture theatres.

A. *Definitions.*

1. *Adult Bookstores.* An establishment having as a substantial or significant portion of its stock in trade, books, magazines, and other periodicals which are distinguished or characterized by their emphasis on matter depicting, describing or relating to "Specified Sexual Activities" or "Special Anatomical Areas", (as defined below), or an establishment with a segment or section devoted to the sale or display of such material.

2. *Adult Motion Picture Theatre.* An enclosed building with a capacity of 50 or more persons used for presenting material having as a dominant theme materials distinguished or characterized by an emphasis on matter depicting, describing or relating to "Special Sexual Activities" or "Specified Anatomical Areas", (as defined below), for observation by patrons therein.

3. *Adult Mini Motion Picture Theatre.* An enclosed building with a capacity for less than 50 persons used for presenting material distinguished or characterized by an emphasis on matter depicting, describing or relating to "Specified Sexual Activities" or "Specified Anatomical Areas", (as defined below), for observation by patrons therein.

4. *Specified Sexual Activities, Specified Anatomical Areas.* For the purposes of this Section, "Specified Sexual Activities" is defined as:

(1) Human genitals in a state of sexual stimulation or arousal.

(2) Acts of human masturbation, sexual intercourse or sodomy.

(3) Fondling or other erotic touching of human genitals, pubic region, buttock or female breast.

and "Specified Anatomical Areas" is defined as:

(1) Less than completely and opaquely covered:

(a) human genitals, pubic region,

(b) buttock, and

(c) female breast below a point immediately above the top of the areola; and

(2) Human male genitals in a discernibly turgid state, even if completely and opaquely covered.

B. *Site Plan Review.*

Application to establish an adult designated commercial enterprise shall be made in writing to the Planning Commission. Such application shall specify the type of adult use or uses that will be catered to, and shall be accompanied by a detailed site plan.

The Planning Commission, having a duty to determine whether a particular use will have a deleterious effect on the surrounding area, will not approve a site plan application if any of the following conditions are found to exist:

1. The site is located on other than a major thoroughfare, as designated in the Master Thoroughfare Plan.

2. The site is closer than 500 feet to the property line of an area zoned residential or a residential use.

3. The site is located closer than 1,000 feet to a site having an adult business designation under this section.

4. The site has failed to gain the approval of 51% of the persons owning, residing or doing business within 500 feet of this location, that approval being evidenced by a petition with notarized signatures, signed by the concerned parties, and presented by the petitioner to the City of Warren for approval and validity of said petition prior to the public hearing.

Further, the site plan shall conform to the specifications as articulated in Section 21.07 of this ordinance and shall contain an elevation of the building and its layout shall be in such a fashion so as not to convey the message of its intended use.

3. Recreation space both indoor and outdoor, health science and related uses including but not limited to the following:

a) health spas,

b) marital arts, instruction in or practice or participation in the martial arts,

c) gymnasiums,

d) massage parlors,

e) turkish baths, bath houses, saunas, or businesses providing whirlpool baths or mineral baths as the primary use,

f) racquetball, handball, tennis, badminton squash courts, Jai–Alai, hockey rinks,

g) reducing salons,

h) skateboard parks, motorcycle rinks roller rinks, children's amusement park, shuffle board, miniature golf, and other similar recreation when part of a planned development.

(31) On May 10, 1978, Sankuer, acting as director of the building department in Bruggeman's absence, issued a memorandum to all personnel in the building department indicating that no permits or certificates of occupancy were to be issued for either 22640 or 22644 without the approval of the City Attorney's office. Sankuer issued the memorandum even though the new ordinance was not effective until May 29, 1978, because he was unsure of whether any requests for permits or certificates of occupancy for 22640 or 22644 Van Dyke should be reviewed under the new ordinance.

(32) On May 16, 1978, Whitman, as president of Michigan Diversified Business Corporation, filed an application for a building permit for 22644 for "interior alteration" and "projection booths". Plans depicting the work to be done were filed either with the application or the next day.

(33) On May 26, 1978, Sankuer notified Whitman's counsel, Carl Rubin, by letter that the drawings submitted with the application needed further detail and resubmission before the permit could be processed to completion. No new plans were submitted until October 1978.

(34) Sometime during the latter part of May 1978, the business at 22460 began providing an escort service in which the customer could purchase the escort service of models on a hourly basis. In addition, hot baths with nude models for an hourly fee were also offered. There were two California hot tubs and a seven-foot bath at 22640.

(35) On June 15, 1978, Sankuer sent a letter to Van Den Branden updating him on the activity at 22640. Sankuer stated that a sign face had been installed in the sign frame above 22640 which read "Art Studio" and "Bath and Escort Service" and showed a bikini-clad female. Sankuer noted that as of the date of his letter, there was no certificate of occupancy issued for either the escort service or the baths, and that it appeared the owner would be challenging the City regarding the occupancy of the building.

(36) On June 26, 1978, Judge Denewith denied a motion to set aside the injunction issued against 22644 on May 1, 1978. On the same day, Noel Lippman, acting as an agent for "Michigan Diversified Business," filed a reoccupancy request for "book store-movie arcade/mechanical device peep show."

Also on the same day, Sankuer received a call from a Warren police officer who indicated that an undercover agent entered the premises at 22640 and enlisted the aid of a model for a stated price of $20.00. Upon payment, the model bared herself from the waist up for the undercover agent to fingerpaint the upper portion of her body. The model indicated that for $75.00, both he and the model would remove their clothing and fingerpaint one another's nude bodies.

(37) In a June 30, 1978, memorandum issued to Van Den Branden, Sankuer indicated in part that Judge Denewith denied the June 26, 1978, motion to set aside the injunction because he believed the defendants should attempt to procure a valid certificate of occupancy. Sankuer further recounted Judge Denewith's warning that if the application was denied, he would review the City's decision to determine if it was reasonable.

In a subsequent memorandum sent to Van Den Branden on July 5, 1978, Sankuer apprised Van Den Branden of Lippman's application for a certificate of occupancy for 22644 and warned that Rubin stated he might file a suit in federal court accusing the City of arbitrarily denying a certificate of occupancy to permit the peep shows installed at 22644. Sankuer requested direction on the application of the new zoning ordinance to both 22640 and 22644. He requested a joint meeting between himself, Van Den Branden, Assistant City Attorney David Dalenburg, Zoning Inspector Gerry Weckesser and City Plan Examiner Les Johnson. No such meeting ever took place.

(38) In mid-July 1978, the City moved for a further preliminary injunction asserting that the premises at 22640 was being used for the painting of nude models in violation of a section of the City's obscenity ordi-

nance.[4] In early August 1978, Michael Gordon/Gordon Studios filed a counter-complaint attacking, in part, the constitutional validity of the ordinance. On September 13, 1978, Michigan Diversified Business Corporation/Danish Adult News/Mel–O–Dee Records filed a separate complaint, seeking an order requiring the City to grant a certificate of occupancy for 22644. *Michigan Diversified Business Corporation, d/b/a/ Danish Adult News, d/b/a Mel–O–Dee Records and Tapes v. Bruggeman, Sankuer, City of Warren,* (Macomb County Circuit Court Dkt. No. 78–26275–CZ.)

(39) Supplemental architectural plans pertaining to construction at 22644 were submitted to the building department sometime between the 26th and 30th of October, 1978, with changes and additional detail required by the building department.

(40) On November 3, 1978, Sankuer sent a letter to Rubin noting receipt of the revised blueprints, indicating that the building department could not approve the certificate of reoccupancy for 22644 because of insufficient information. Sankuer stated that the building department needed more information to determine whether the peep shows advertised on the sign above the store depicted matter defined as "specified sexual activities" or "specified anatomical areas" under the newly enacted zoning ordinance.

(41) On November 21, 1978, Rubin sent a letter to Assistant City Attorney Dalenberg explicitly stating that his clients intended to use coin operated devices to exhibit movies containing specified sexual activities and specified anatomical areas as defined under the zoning ordinance. Rubin requested that the building department issue a certificate of occupancy or deny the June 20, 1978, application. This letter was transmitted to Sankuer on December 8, 1978.

(42) On December 12, 1978, Sankuer sent a letter to Van Den Branden discussing

Rubin's November 21, 1978, letter acknowledging that movies containing speech defined under the ordinance as specified sexual activities and specified anatomical areas would be shown at 22644. Sankuer stated that the certificate of reoccupancy would be denied because the films described by Rubin were covered under the portion of the zoning ordinance pertaining to adult mini-motion picture theatres of 50 persons or less.

(43) On December 16, 1978, Dalenberg contacted Sankuer concerning a letter Dalenberg received two days earlier from Rubin reiterating his desire for a decision on the certificate of occupancy application. In a letter sent to Rubin the following day, Sankuer stated:

> This office has received a letter from the Assistant City Attorney David L. Dalenberg with regards to the Circuit Court of Macomb File No. 78–2669–CZ. The place in question is 22644 Van Dyke Ave.
>
> Attached was the letter from Taylor and Rubin, Attornies [sic] at Law requesting a certificate of re-occupancy and stating that the Danish Adult News intends to operate devices commonly called "peep" shows that exhibit movies containing specified sexual activities and specified anatomical areas.
>
> Based on the above this office denies the certificate of re-occupancy for the use of these devices and/or for the showing and viewing of films as aforementioned under the enacted amendment of Ordinance No. 30 of the City of Warren's Ordinances, specifically Article 14, Section 14.02 under Paragraph C—Adult Mini–Motion Picture Theatre of 50 persons or less and Paragraph D, specifically sexual activities and specified anatomical areas.

(44) On December 22, 1978, another amendment to section 14.02 of the zoning ordinance was passed by the City Council. It became effective on January 16, 1979.

---

**4.** The provision challenged was Ordinance 8–241 which stated:

"No person shall knowingly engage in any business which offers as its principal activity the provisions of nude models for artists and photographers."

The amendment added escort services and nude body painting or modeling studios to the list of adult uses requiring site plan review and special land use approval before a certificate of occupancy could be issued.

(45) On February 8, 1979, Rubin filed written interrogatories in the action filed by Michigan Diversified Business Corp. These interrogatories were apparently forwarded to Bruggeman. On February 22, 1979, Bruggeman sent a memorandum to Dalenberg which included the answers to each question. The first interrogatory asked whether the resubmitted plans complied with the building code. In response, Bruggeman's answer was "no." In response to a follow-up question asking what specific provisions were violated, he indicated that the plans and specifications did not comply with the electrical, plumbing, and zoning codes.

(46) On February 28, 1979, Rubin filed a motion to compel answers to the interrogatories on the ground the answers submitted by the City were evasive and incomplete. On March 1, 1979, Dalenberg sent a memo to Bruggeman through Van Den Branden with a copy of the interrogatories and motion to compel attached. Dalenberg stated that at a hearing before Judge Denewith on November 20, 1978, he had been told by Johnson and Sankuer that the plans conformed to the building code. Based on this information, Dalenberg indicated in a response to a question posed by Judge Denewith that the plans were in compliance with the building code but were not in compliance with section 14.02 of the zoning ordinance. Because Bruggeman's answers to the February 9, 1979, interrogatories indicated that the plans did not comply with the electrical, plumbing and zoning codes, Dalenberg requested that Bruggeman provide the following amended answers to the interrogatories:

(a) What requirements of the building code are violated in the plans and specifications?

(b) State with specificity which items need amendment or correction?

(c) What changes have been made in the plans and specifications submitted prior to the November 20, 1978, hearing which make them now violative of the electrical, plumbing and zoning codes?

Dalenberg further indicated that it was not possible to contend that the recently adopted BOCA Code (January 1, 1979) was applicable since the plans were submitted prior to the effective date of the BOCA Code.

(47) Bruggeman responded to Dalenberg's directive by way of a letter to Van Den Branden dated March 12, 1979. Initially, Bruggeman indicated that although Sankuer recalled testifying that the plans were in accordance with the building code, Johnson could not recall any statements to that effect. He then opined that the plans, initially submitted May 16, 1978, must comply with the 1970 edition of the BOCA Code adopted by the City Council on November 6, 1974, as an emergency ordinance. During the late 1970's, the City had become engaged in litigation with the state over whether the City could maintain its own local building code. The emergency ordinance was passed to ensure that some code existed in the event that the Warren Building Code was struck down and the City was forced to adopt the BOCA Code or another nationally accepted code. Based on several communiques issued during the litigation, Bruggeman concluded in his letter that the emergency ordinance was in effect, thus placing the 1970 edition of the BOCA Code in effect at the time the plans were first submitted. Bruggeman described these communiques as follows:

1. A letter dated April 25, 1978, from the City Attorney W. Thomas Marrocco, Jr. addressed to Mr. Paul Van Den Branden, Director of Public Service bringing to our attention the current status at that time of our litigation with the State Construction Code concerning the administration of the BOCA Code.

2. The letter of May 5, 1978 from the Director of Public Service addressed to the undersigned notifying this Division that we were to commence at once with the enforcement of the 1970 Edition of the BOCA Basic Building Code.

3. A letter under the date of June 13, 1978 from Mr. Patrick J. Sankuer who was the Acting Director at that particular time, to all our personnel informing them that the enforcement of the 1970 Edition of the BOCA Basic Building Code was mandatory.

Bruggeman thus concluded that any statements made during the hearing before Judge Denewith that the plans were in compliance with the building code in effect at that time (BOCA, 1970 edition) were in error. He then proceeded to answer the three questions posed by Dalenberg.

(48) Sometime after November 1979, the location at 22640 began offering the "Velvet Touch" with nude or partially nude females at prices dependent upon the degree of nudity of the female.

(49) With the legal status of the businesses at both 22640 and 22644 yet unsettled, and the two actions before Judge Denewith still pending, the conflict between Whitman and Warren city officials began at 5583 Eight Mile Road.

### C. *5583 East Eight Mile*

(50) The building located at 5583 East Eight Mile is a long narrow two-story building approximately 30 feet wide by 80 feet long. It is located at the corner of East Eight Mile and Blackmar: the parties stipulated that it is within 500 feet of a residential use.

(51) In 1968, the owner of the building located at 5583 opened a retail carpet outlet. On May 8 and 9, 1968, the building was inspected by all the divisions of the building department; all inspections were approved except the electrical inspection conducted by electrical inspector George Gower. On May 14, 1968, less than a week later, an electrical permit was pulled to correct the violations. Two days later, on May 16, 1968, the work was approved by Gower. A certificate of occupancy was issued on June 11, 1968.

(52) In 1976, the use of the building changed to that of a paint store. A special permit for reoccupancy inspections was is-

sued on April 27, 1976. The building file maintained by the building department indicates that once again Gower refused to approve the electrical inspection. An electrical permit was pulled on May 10, 1976, to correct the violations. Inspecting the premises for a second time on May 10, 1976, Gower listed six violations. On May 12, 1976, Gower conducted a third inspection, and indicated that not all the violations cited on May 10 had been remedied, and rejected the work for a third time. Gower finally issued his approval the next day, May 13, 1976. A certificate of occupancy was apparently then issued.

(53) The building was vacated by the paint store in 1978; the owners apparently began preparing the building for reoccupancy by another commercial enterprise. This is evident from the building department file which indicates that a special permit for reoccupancy inspections was issued on December 28, 1978. Once again, the building failed the electrical inspection; inspector William Carr listed seven violations during his January 4, 1979, inspection. Approximately one week later an electrical permit was pulled to correct the violations, and on January 16, 1979, Carr reinspected the building. He again rejected the work, citing several new violations. Carr inspected the premises for a third time on January 19, 1976, and again rejected the work, this time adding three new violations. The work was finally approved on January 26, 1979, by inspector Ralph Dinger.

The plumbing inspection had also failed because of the absence of a back-flow preventer.[5] On January 23, 1979, a plumbing permit was pulled to install a back-flow preventer, and the work was inspected and approved on January 30, 1979.

(54) Acting on behalf of Whitman, Lippman located the building at 5583 sometime in 1979, and recommended it to Whitman because of its high drive-by and potential for expansion. Whitman testified that he was not interested in the building for his own use, but was interested in opening a

---

5. A back-flow preventer is a device which ensures that the water utilized at a particular building location does not back-up into the City's water delivery system.

store for Christy as payment for money owed by Whitman to Christy as a result of services rendered by Christy to several of Whitman's businesses.

(55) Christy first worked as a masseuse at a store owned by Whitman in Ann Arbor in July 1978. Christy was promoted to the position of manager by September 1978. She expressed an interest to Whitman in starting and running her own business. Whitman told Christy that she could work as a secretary for Sun Services, a Whitman corporation which serves as the bookkeeping entity for each of his businesses, learn the business, and that after a couple of years he would help her open her own store.

(56) Christy started as a secretary sometime in September 1978, and was to be paid $200.00 per week. In October or November 1978, Whitman bought the Cornerstone Grocery store; Christy managed the store when it opened and was to be paid $100.00 per week. Christy testified that she worked long hours during the next eighteen months, not only working as a secretary for Sun Services and manager of Cornerstone Grocery, but also doing any other tasks she was asked to do for Whitman's businesses.

(57) Christy was never paid for her services and testified that by January 1980, Whitman owed her $13,000.00.[6] As payment for debt, both Christy and Whitman testified they agreed that Whitman would find a building for Christy, remodel the building, and fill it with stock from his warehouse. The agreement was never reduced to writing.

(58) On January 1, 1980, Karen Christy leased the building at 5583 from X.O.N. Development Corporation.[7] Although nei-

ther Whitman nor Christy knew it at the time, Lippman was one of the principals of X.O.N., and X.O.N. had purchased the building from B & B Management on land contract. The lease between X.O.N. and Christy was for two years with an option, later exercised, to renew for an additional three-year period. The lease payments were established at $675.00 per month for the first year and $775.00 per month for all ensuing years, plus insurance, taxes, and utilities. The lease payments were paid by Whitman through Sun Services.

(59) Sometime in late 1982 or early 1983, Lippman stopped making payments to B & B Management. B & B Management began foreclosure proceedings against Lippman; Whitman then discovered that Lippman was the moving force behind X.O.N. and that he was pocketing the difference between the amount Sun Services paid and the amount Lippman paid B & B Management. On June 22, 1983, Christy purchased the land and building at 5583 for $50,000.00, simultaneously transferring title to Newsreel Services.

The $15,000.00 down payment, however, was paid by Sun Services. Sun Services also paid each payment through July 1984. The rent payments to Lippman, the $15,000.00 down payment and the mortgage payments paid by Whitman totaled approximately $17,000.00.

(60) At the time Christy entered into the lease, she testified that she intended to use the building as a retail outlet to sell women's lingerie and as a full service video store. She described the clothing she intended to sell as sheer, romantic, sexy lingerie which is flattering to the female body. The video component of the store was to be geared towards the sale and

---

6. Christy continued to work for Whitman for several years bringing the amount owed to her, including interest, to approximately $60,000.00. Although Christy's attorney during that period, Gregory Lord, testified Whitman signed a promissory note Lord had drafted, neither Whitman nor Christy recalled a promissory note. A finance statement covering 160 head of Hereford and Angus beef cattle owned by Whitman was signed by Whitman and Christy. There was no indication on the statement that it had been filed with any municipal office.

7. Christy actually signed on behalf of Christy Sales and Services, Inc. which had not yet been formed. Although the corporation was ultimately formed with Whitman as its secretary, Christy testified that the corporation was never active. She further testified that she formed Newsreel Services because she wanted a separate corporation totally independent of Whitman.

rental of videos, as well as the transfer of home films to video cassettes.

(61) Sometime in April 1980, Whitman or Christy contacted general contractor George Ketchum to perform certain work at the building at 5583 in order to prepare the premises for opening. Ketchum is from the Lansing area. He testified that his work for Christy and Whitman comprises between 60 and 80 percent of his entire work-load. He testified that he was told by either Christy or Whitman that the building was to be used for video sales and service, as well as the sale of women's lingerie.

(62) On April 21, 1980, Ketchum went to the building department and filled out a building application indicating that he intended to fill in an overhead door opening with masonry and install a three-foot exit door; he also indicated he was going to enclose an exterior front window. He listed Christy as the owner, although he was unsure whether Christy or Whitman was the owner. He was informed by the clerks at the desk that he would have to have a plan; he was ushered into the zoning office where he talked to Bruggeman and Les Johnson, the Plan Examiner, who helped Ketchum sketch the drawings. The application was approved within an hour, and a building permit was issued. The work was completed within the next several days, and approved by a building inspector on April 30, 1980.

(63) Ketchum also hired an electrician, Paul Tucker, to install several outlets in the building. Ketchum called Tucker after seeking an advertisement of Tucker's in the paper. On May 29, 1980, Tucker obtained an electrical permit authorizing electrical work to be done on up to six circuits. After Tucker completed the work, Ketchum testified he inspected the work and it appeared to have been properly and neatly done. The primary work done by Tucker was the installation of six receptacles containing four outlets each allegedly to service the transfer tape operations. The receptacles were located on the floor in the middle of the building.

(64) On June 6, 1980, Inspector Nielson from the electrical bureau conducted an inspection of the work done by Tucker; neither Tucker nor Ketchum was present during the inspection. Upon entering the building, Nielson noticed that a good deal of construction was taking place. He observed a platform under construction with sheets of plywood partially covering the joists; he saw a mansard roof covered with wooden shingles which he testified looked fairly new, and a newly constructed partition around the boiler. He testified that it was obvious from the sawdust and lumber strewn about the building that the construction was of recent origin and still ongoing. In addition to the receptacles laying on the floor in the middle part of the building, Nielson observed what is known as a "false ceiling"; only a portion of the ceiling tiles were installed. Nielson also noticed that the cords to the fluorescent lights hanging level with the false ceiling were plugged into outlets attached to the original ceiling.

(65) Nielson rejected the inspection and notified Ketchum of the denial in writing several days later.[8] Nielson made the following comments in his report: "(1) Building Permit Required; (2) C. of O. Required (Sec. 119–6 of BOCA); (3) Must meet contractor on job for inspection; (4) Cannot have cord above the false ceiling; and (5) Inspection not complete."

(66) Neilson testified that although he was not a building inspector, it was not uncommon for inspectors to indicate to owners or their agent during an inspection that a permit might be required for work being done even though not in the inspector's area of expertise. Neilson indicated that he thought the construction of the stage, mansard roof, partition and new ceiling may have required a permit. Neilson did not explain why he cited the need to obtain a certificate of occupancy; Bruggeman testified that a certificate of occupan-

---

**8.** Although a copy of the electrical permit with Nielson's approval on it was given to Ketchum by Tucker, Nielson's signature was apparently forged by Tucker in order to obtain the amount owed him for his labor.

cy could be obtained either before or after a permit is obtained to alter or remodel a building.

With respect to the need to have a contractor on the premises, Neilson indicated that it was necessary for him to know exactly what the building would be used for before he could conduct an inspection. He stated that the use of outlets laying on the floor, for example, would indicate which provisions under the N.E.C. he would have to apply in conducting his inspection. The electrical permit did not list the intended use of the building; when he returned to the building department he apparently discovered from the April 21, 1980, building application that the building was to be used for video sales and service, but was unsure whether the tapes were for sale or to be shown to the public.

The cords above the ceiling were cited as a violation by Neilson because they were not encased in conduits as required under section 400-4 of the N.E.C. Nielson finally concluded that it was useless to continue the inspection since he would have to return when a contractor was on the premsies.

(67) Ketchum testified that the only construction he had done other than that for which he had been issued a permit was the building of a raised platform and partition around the boiler and the installation of pegboard underneath the mansard roof. The stage was T–shaped and was constructed with 2′ × 8′ joists with tongue and groove plywood nailed on top of the joists. It was located in the front of the store and was to be encompassed with four and five-foot showcases along the perimeter. Both Christy and Whitman testified that they presently use such raised platforms in their stores to provide the clerks a vantage point from which to monitor browsing customers in an attempt to guard against shoplifting. Ketchum testified that he didn't think he needed a permit to construct the stage because it was freestanding and unattached to the floor. Ketchum also stated that he didn't think a permit was necessary to build the partition and install the pegboard. Ketchum indicated that the man-

sard roof was already there, as was the false ceiling; all he had done to the ceiling was replace some of the ceiling tiles.

Ketchum also testified that he was unaware that a certificate of reoccupancy was necessary when the change was only from one use to another within a use group. He indicated that his conclusion was based on his experience in other cities where he had remodeled buildings for Whitman previously used as retail stores and no certificate of reoccupancy was required.

(68) On June 11, 1980, Ketchum acquired a special permit for reoccupancy inspections and the inspections were scheduled for June 17, 1980. On June 17, 1980, Inspectors Mills, Wineski, Zimmerman and Nielson arrived at the premises from the plumbing, zoning, building and electrical bureaus, respectively. Ketchum, who was present during the inspections, testified that the inspectors only asked him two questions—what the premises was to be used for and the name of the owner. In response to the first question, Ketchum told the inspectors that it was to be used for video sales and service. Upon further questioning, Ketchum told the inspectors that that was all he knew. In response to the second question, he told them Karen Christy was the owner.

Bill Henry from the heating bureau did not attend the June 17, 1980 inspection and attempted to inspect the premises on July 1, 1980. Ketchum was not there, however, and the building was locked.

(69) Only the plumbing inspection was approved. The zoning, building, electrical, and heating inspections were all rejected. Wineski indicated in his report, that he needed more information before he could approve the zoning inspection and indicated that Christy should contact him.

Zimmerman listed the following nine violations in his report: "(1) Repair gutter in rear; (2) Point up block, (3) Fill voids over doors; (3) Caulk front door; (4) Question on use of building; (5) Building Permit required for new ceiling and interior work done; (6) New floor tile; (7) Fire proof self-closing door to garage; and (8) Ceiling under upstairs living area may not be fire

proof?" The results of the inspections were sent to and received in the mail by Ketchum sometime in late June or early July 1980; Ketchum forwarded the results to Christy.

(70) Neilson listed 17 violations in his report.[9] The final four were not added until Nielson returned to the building department.

(1) install conduit correctly; (2) anchor all conduit and boxes; (3) install all k.o. blanks; (4) install all covers; (5) need disconnenct [sic] switch at boiler; (6) remove open wiring—all wire must be in conduit; (7) must have a slight switch controlling a light for each room that can be walked into; (8) cannot have cords and plugs above the false ceiling. Wire lights to code; (9) see violations on Permit # 147841; (10) all work must be done by an electrical contractor and permit required; (11) all fuse holders (plug type) must be Type "S;" (12) identify all circuits; (13) check with the building inspector for building permit; (14) emergency lights, if required, shall comply with Article 700 NEC and BOCA Code; (15) each occupant shall have access to their over current devices; (16) install exit lights to code; and (17) service shall have sufficient capacity for the building.

Plaintiff's Exhibit J-7.

Henry rejected the inspection because he could not gain entrance to the building. Nielson and Gower testified that it was common practice to reject an inspection when, for some reason, the inspector is unable to gain entrance to a building. They testified in most instances the owner

or agent will call the building department to establish a new inspection time.

(71) Shortly after the inspection was conducted, Bruggeman, accompanied by Nielson, inspected the premises. Bruggeman verified the presence of the mansard roof, the partially completed stage, the partition and the outlets on the floor. He also noted the presence of what looked like a ticket booth.[10] Bruggeman testified that he surmised the construction had been recently done based on his communication with Nielson and Zimmerman's report. Bruggeman further testified that he thought the stage and ticket booth resembled those at 22640. He also testified that he thought the receptacles located on the floor were consistent with the use of peep shows.

(72) Believing that work requiring a permit had been done without a building permit, and that someone was trying to sneak another adult use into the City in violation of the 500–foot location restriction contained in section 14.02, Bruggeman placed a stop-work order on the building. Section 122.1 of the BOCA Code provides for the issuance of such an order. Section 122.2 provides:

122.2 **Unlawful continuance:** Any person who shall continue any work in or about the structure after having been served with a stop-work order, except such work as he is directed to perform to remove a violation or unsafe condition, shall be liable to a fine of not less than [amount] or more than [amount].

The stop-work order used by the City of Warren is a red rectangle card measuring approximately six inches by seven inches.[11] Bruggeman testified that stop-work orders

---

9. Scribbled at the top of one of Nielson's inspection sheets was "Noel Lippman owner. X-on corp-owner or bldg." Nielson testified that he did not write the comment nor did he know who did.

10. Although Christy, Whitman and Ketchum all testified that there never was a ticket booth at 5583, Ketchum acknowledged that he did a substantial amount of cabinetmaking on the premises.

11. Although the stop-work order does not provide space to indicate the reasons for the orders issued, the stop-work order placed on 5583 was not introduced at trial; it is therefore uncertain

whether the reason for issuing the stop-work order was written on the order as was the case with the sample order introduced into evidence. Written on that order are the words "No Permit."

A report filed by Zimmerman on June 23, 1980, indicates that the stop-work order on 5583 had been torn down; Zimmerman reposted the stop-work order. Ketchum testified that he believed that vandals or a passerby had torn the order down and asked that the order be reposted inside the building to avoid further problems.

are frequently used when an owner attempts to perform work requiring a permit without first obtaining a permit. Once a stop-work order is placed on a building, no work, not even ordinary repair work as defined under section 102 of the BOCA Code can be performed unless directed by the building department. Bruggeman stated that the purpose of a stop-work order under such circumstances is to induce the owner or agent to secure a permit for the desired work.

(73) Bruggeman testified that contrary to common practice, neither Ketchum nor Christy attempted to contact him regarding the stop work order or rejection of the certificate of occupancy. In an attempt to find out who Christy was, determine the intended use of the building, and ascertain whether the building had been abandoned, Bruggeman made several attempts to contact Christy at the telephone number listed on the building application. Each time he called, a woman answered the phone, indicating that Bruggeman had reached the Cornerstore Grocery, and stated that she couldn't divulge whether Christy worked there. Bruggeman called the Cornerstore Grocery several times during the five-week period following the June 17, 1980, inspection, each time meeting with the same result.

(74) While awaiting a response from Christy, Bruggeman consulted the tax records in order to verify that Christy owned the premises at 5583. He discovered that X.O.N. had purchased the land and building from Bert Stahl of B & B Management; when he called Stahl, Bruggeman learned that Stahl was unaware that the building would not be used by Lippman as an autoparts store as Lippman had told Stahl.

(75) In late July, 1980, Christy finally called Bruggeman; Bruggeman asked her to come to the building department so that he might meet with her. She agreed and met with Bruggeman in his office shortly thereafter. Steven Hall, an employee of Whitman and friend of Christy's, was also at the meeting but was not identified. Who else attended the meeting and what was said at the meeting is in dispute.

(76) Christy testified that all the inspectors, a man identified by Bruggeman as the Mayor's right-hand man, and another man identified as a police officer were at the meeting. Christy testified that she thought the purpose of the meeting was to discuss the building violations, but that instead was interrogated. She stated that Bruggeman took her driver's license and was asked why the application said Carol when her name was Karen. According to Christy, the police officer also asked her several questions. She stated that Bruggeman asked her about her connection with Lippman and told her he was worried about Lippman trying to sneak an adult use into the store once the lease expired; he also allegedly told her that he had no intention of letting Lippman in the City and that they "would close the Van Dyke location down if it was the last thing they did." Christy testified that she left the meeting under the impression that she would not be permitted to open her store because of her association with Noel Lippman.

(77) Bruggeman testified that he was the only official from the building department at the meeting. He stated that Christy was very evasive when he asked her why she had waited so long to contact him and what she intended to do with the building. Although she told him she intended to rent and sell videos and transfer film to video, he was uncertain whether she would, because of her association with Lippman, be renting, selling and transferring pornographic films. Bruggeman further testified that Christy was evasive when he questioned her about the intended use of the stage, receptacles and platform and inquired why the work was done without permits.

(78) On November 14, 1980, a second meeting was conducted in which Christy brought her attorney, William Swor. Swor was employed by Whitman. Again, who attended the meeting and was what was said is in dispute. Christy testified that the same building officials were there, but Sankuer testified that he was called into the

meeting after it had already started and that other than Bruggeman he was the only building official present.

Christy testified that Bruggeman stated that Christy had, in fact, violated no laws and that her intended use of the building at 5583 would, in fact, be lawful. She stated that Bruggeman went on to state that he would, nevertheless, withhold all building permits and certificates of occupancy from Christy because of her association with Noel Lippman unless and until Noel Lippman gave him satisfactory assurances that he would not use the building for an "adult bookstore" after Christy's lease expired. Swor testified that during the meeting he acknowledged that adult material would be sold, but maintained the position that the store would not be an adult business under section 14.02 of the Warren zoning ordinance.

Bruggeman testified that during the meeting, Swor made the comment: "what else was property on Eight Mile good for" (other than adult uses). When asked, Swor did not deny that he made such a remark. Bruggeman conceded that he said it would take a court order before he would allow work to continue on the premises. He de-

nied that he made any statements during the meeting about Lippman using Christy as a vehicle to sneak in another adult use.

(79) On November 17, 1980, Swor filed an action under 42 U.S.C. § 1983 on behalf of Christy in Macomb County Circuit Court naming Bruggeman, then Mayor Bates and the City of Warren as defendants. The complaint requested damages and an order to show cause why a preliminary injunction should not be issued restraining the defendants from interfering with Christy's right to enter the building in order to complete the necessary repairs to qualify for a certificate of occupancy. The case was dismissed without prejudice, apparently in lieu of the pending action in this Court filed by Christy (later consolidated under *15192 Thirteen Mile Road*) challenging the constitutionality of the Warren zoning ordinance.[12]

(80) No permits were sought to remedy the violations cited in the July 17, 1980, inspections until May 18, 1981, when Ketchum filed an application for a building permit. Ketchum listed Carol Christy as the owner and indicated "retail-video sales and service, repair work, point up blocks,

---

**12.** On February 22, 1981, heating and building inspections were apparently conducted. Ketchum did not recall the inspections nor why they were called. Contained in the building file is a document signed by building inspector John Bulger indicating that he had checked the building at 5583 and found the following violations to exist: "1) exitlights to be lighted at all times; 2) self-closer on door to garage; 3) signs of leakage at ceiling and pool of water at boiler room and toilet room area—correct; 4) point up interior block walls; 5) repair floor tile, both rooms; 6) repair cracked walls; 7) emergency lights required for room without windows; 8) ceiling above drop ceiling between store and dwelling unit above to be repaired ⅝" drywall minimum; 9) point up exterior block and brick walls; 10) repair lintels over exterior doorways; and 13) remove electric conduit and boxes from floor, unsafe." The document contained no salutation.

This report was preceded by another report filed by Bulger in September 1980. On September 25, 1980, the Service Division referred a citizens' complaint regarding the condition of 5583 to the building department. Bruggeman testified that although the Service Division had several full-time employees whose job was to respond to such complaints, complaints are of-

ten referred to his division. Bulger was assigned this particular complaint. He reported that he checked the premises on October 6, 1980. He further indicated that he reposted the stop-work order which apparently was missing.

The complaint was reopened on October 14, 1980, to check allegations of broken windows and glass and debris on the premises. Bulger's report indicated that he checked the building on October 15, 1980, and found the exterior of the building to be in very good shape; he detected no broken glass or windows. Although he noted that debris had gathered in the right-of-way on the side street sidewalk and curb, he thought that the debris was from a nearby business.

Also contained in the building file is a copy of an inspection report by plumbing inspector Bill Henry dated February 22, 1980. The report states:

"Reject—2-22-80

(1) Boiler to be checked and cleaned by contractor—check all controls per City of Warren Codes.

(2) Need letter of verification from contractor

Thirty days to comply"

Although the inspection is dated February 22, *1980,* as opposed to February 20, 1981, the inspection was apparently conducted in 1981.

old door panel bar, etc." on the application. Attached to the application was a hand drawn sketch of the repair work to be done. Ketchum testified the application verified that he did not seek a permit for any new construction work, but only to repair the violations cited earlier. When asked why he had waited until nearly a year later to attempt to remedy the inspection violations, he stated that he was waiting for directions from Christy or Whitman and indicated that the stop-work order was still outstanding

(81) The sketch was rejected by correspondence from Weckesser, Johnson, and Nielson. In a letter dated June 26, 1981, Weckesser indicated that the Zoning Bureau rejected the application.

1) Plan review fee not paid. 2) Four (4) sets of plans required. 3) Plan states that use of building is questionable at this time. I need to know if the building will be used for any use mentioned in Section 14.02 of the Zoning Ordinance # 30. 4) Application states first floor only; however, there is no mention of this in the lease. I need to know what will be the use of the second floor and if it is to be used for any use mentioned in Section 14.02 of the Zoning Ordinance # 30. 5) Lot size and legal description do not match.

(82) The electrical requirements of the sketch were rejected by Nielson in a letter dated June 30, 1981, for the following reasons:

1) Riser diagram and load calculations required for the complete building service; 2) shall show service location; 3) show that emergency exit lights comply with Article 700 N.E.C.; 4) shall show that each occupant will have access to their overcurrent devices; 5) show that the service has sufficient capacity for the building; 6) shall show lighting layout, circuiting switching.

In a letter dated June 26, 1981, Johnson cited the following reasons in support of the building department's decision to reject the plan:

1) indicate use of all areas of building;
2) indicate on drawing the construction to be done ... in sufficient detail to show how construction is to be done; 3) indicate all construction costs on application; 4) indicate exiting (door sizes, types of doors, etc., types of doors, etc.); 5) indicate fire separation of mixed uses.

Johnson testified that he telephoned Ketchum three times in mid-June to discuss the application and sketch but could not reach him. When asked about the delay between the filing of the application and his response to Ketchum, Johnson testified that based on the number of applications they were required to process each day, the delay was not atypical.

(83) The sketch was apparently sent back to Ketchum in Johnson's letter in accordance with the building department's policy of returning rejected plans to the contractor for necessary revisions. Neither Ketchum nor the building department had the sketch or a copy.

(84) Ketchum submitted a new set of plans dated June 30, 1981; they were time stamped July 6, 1981, by the building department. Although the plans do not contain an architect's stamp or seal, they were drawn by someone with some degree of drafting skill.

The plan is a floor plan drawn on a sheet of paper approximately 12′ × 17′. At the bottom of the plan is the address of the building and the phrase "use of bldg. not determined." Immediately below that is inserted "capacity for merchantile—76," and below that "Capacity for Public Assemb. 156."

The building as drawn is separated into its three sections with the overall dimensions and dimensions of each room indicated on the side in the customary fashion. The use of each room is inscribed at the center of each room; the plan shows that the front room closest to the main entrance is to be used for "sales," the middle room for "service and repairs", and the back room for "storage." The three existing exterior doors along the east side of the building parallel to Blackmar are shown as is the interior door between the middle and back rooms. The plans indicate that the interior door between the middle and back

rooms is to be removed, the space enlarged, and a 3' × 6' fire-rated door installed. In the lower right corner of the plan is drawn a detailed description of the opening and the lintels.

(85) Ketchum testified that after submitting the plans, he was called several times by the building department and told the permit was ready to be picked up, but each time he arrived he was asked for more information. On one such occasion he was asked to submit four copies of the plans. He testified that he had not submitted four sets of plans because he had never before been asked to submit four sets and he had submitted the new plans before receiving Weckesser's letter. Ketchum testified that when he arrived at the building department on another occasion, one of the clerk's asked who owned the building. Ketchum told the clerk he didn't know; the clerk left the counter and when she returned, told Ketchum that Noel Lippman was the owner. Ketchum then scratched out Christy's name on the application and wrote in Noel Lippman's name.

(86) Ketchum testified that on July 20, 1981, he received another call from the building department and again went down to pick up the permit. When he arrived he was told by a clerk that it "hadn't come down yet," from the inspectors' offices on the second floor. Ketchum testified that he called Swor and then went to Assistant City Attorney Flynn's office and told him to contact Swor. Flynn apparently talked to Swor and then told Ketchum to return to the clerk and he would be issued the permit. When he talked to the clerk, she went and got Johnson who came to the counter. Ketchum testified that Johnson said they would not issue the permit and might sit on it until 1986. Ketchum again went and telephoned Swor. Ketchum waited for several minutes at the department until Swor talked to Flynn and Flynn told either Johnson or the clerk to issue the permit. Ketchum was finally issued the permit.

(87) Attached on the back of the plans is a routing card containing the signature of inspectors from each of the five bureaus. Each signature is preceded by the date of the signature; the dates range from July 14 to July 17, 1981. Enclosed in parentheses next to Johnson's signature is the inscription "see all notes next to the drawing." Similarly, next to Nielson's signature is inscribed "see electrical notes"; eight notes are written on the back of the plans. Next to Weckesser's signature is the statement "signed under protest."

(88) The only time Johnson met with Ketchum regarding the new plans was when they were first submitted. He met with Ketchum at the desk and inquired about what would be sold in the front room and what would be serviced and repaired in the middle room. He asked Ketchum to write in "Video Tapes" above "sales" in the front room and again above "service and repairs" in the middle room. He denied that he talked to Ketchum on July 26, 1981, or that he ever told Ketchum they would sit on the application.

Johnson testified that normally plans would not be required for repairs unless they were major repairs. He indicated that plans normally are unnecessary when the only construction is the changing of a door.

(89) On July 30, 1981, Bruggeman sent a letter to Warren Chief of Police Charles Grosbeck advising Grosbeck that the building department had held up the building permit and the certificate of occupancy on the assumption that the premises would not be used for retail video sales and service as indicated on the application and that an adult business was being sneaked in along the same line as the businesses at the Van Dyke locations. Bruggeman stated that their assumption was based entirely on the following factors: 1) Noel Lippman, a key player in the controversy over the use of the Van Dyke premises was also a principal in the 5583 endeavor; 2) Warren detective Rollo's determination that Christy is of questionable character; [13] 3) Christy's

---

13. Rollo apparently told Bruggeman that Christy had been arrested for prostitution while a model at Gentlemen's Retreat. Christy denied that she was ever arrested for prostitution; no evidence was introduced that she actually was convicted.

attorney, William Swor, specialized in the representation of "porn shop operators" and was reported to be the owner of "Gentlemen's Retreat," an establishment in Warren offering "rap sessions" with semi-nude models; and 4) Christy was listed as the owner of the building when in fact Lippman had purchased the building on land contract from B & B Management.

Bruggeman testified, however, that the permit was immediately granted after he was informed by Flynn that a permit could not be refused on the assumption that an adult business is about to commence.

(90) On August 3, 1981, building inspector George Gower met Ketchum at 5583 to conduct an inspection, but refused to do so because the permit and approved plans were not on the job as required under the BOCA Code and the building permit.

(91) In mid-October 1981, Bruggeman requested status reports from the various inspectors concerning 5583. In a letter to Bruggeman dated October 22, 1981, Nielson stated that the violations cited on June 27, 1980, still existed and that no electrical permit had been pulled since the inspection. Gower reported the attempted inspection on August 3, 1981; he indicated that no further inspection had been called despite Gower's instructions to Ketchum to recall the inspection once the plans were on the site. Plumbing inspector Doelle advised Bruggeman that no plumbing permits had been issued.

(92) After Randlett was elected mayor in November 1981, and Sevitto was appointed Director of Public Services, Bruggeman briefed Servitto on the ongoing litigation over the Van Dyke locations. Servitto then issued an inter-office memorandum advising the building department that he wished to be apprised of any applications for an adult use within the City. Servitto testified that he issued the memo so that he could stay abreast of any activity involving potential adult uses and thereby ensure that everything was done "by the letter of

the law." He stated that he issued similar memos in other situations which presented potential legal problems. He further testified that he never made any decisions regarding 5583 and was not aware of Bruggeman's July 30, 1981, letter to Chief of Police Grosbeck.[14]

(93) A second occupancy inspection was conducted on January 13, 1982. Nielson found the same violations cited June 17, 1980, to be present.

Building inspector Gower cited seven violations:

"1) Minimum three (3) hour fire rated separation from residential occupancy not installed per approved plans; 2) minimum two (2) hour fire rated construction for stairway not installed per approved plans; 3) must install exit lights and exitway emergency lighting system per approved plans; 4) must install sprinkler system in boiler room per approved plans; 5) must install fire rated door between garage area and service area per approved plans; 6) must correct all violations listed on request for certificate of occupancy dated June 11, 1980; and 7) must make all mechanical renovations and repairs. Plumbing, heating and electrical inspections to be made on separate permits per approved plans."

Each of the cited violations tracked the notes placed on the approved plans by Les Johnson.

Ketchum testified that with respect to the first violation, the ⅝" gypsum board was rated as three-hour fire separation. He also emphasized that the application specifically stated that the second floor would not be used. With respect to the second violation, Ketchum indicated that he added ⅝" gypsum board to the original ½" layer, providing much more than a two-hour fire separation.

Zoning inspector Carr noted the information on the application indicating that the building would be used for "Video Sales and Service" was insufficient to determine

---

**14.** Although Servitto testified at trial that he held regular meetings with his staff regarding zoning decisions under 14.02 of the zoning ordinance, no specific instances of such meetings involving any of the proposed adult uses were indicated discussed by either Servitto or any other inspectors who testified at trial.

the exact use of the property and whether approval was necessary from the Planning Commission. Carr indicated that Ketchum, who was on the premises during the inspection, did not have any information that would clarify the problem.

Heating inspector Henry rejected the inspection noting that the boiler needed the heat exchanger tested by a contractor.

(94) An electrical permit was issued on January 26, 1982, to electrical contractor J.D. Wisner. The owner listed on the permit was Jack Shoultes, Terry Whitman's brother and an employee of Newsreel Services. An inspection was conducted by Nielson on March 17, 1981. Many of the previous violations were corrected; Nielson rejected the inspection, however, noting the following violations in a letter sent to Wisner:

1) New wiring shall be accessible for inspection; 2) need 36" clear area in front of the service equipment; 3) riser diagram and load calculations required; 4) note: check with Edison about service—2 meters to one building or occupant; 5) anchor the emergency light fixture; 6) the emergency battery unit shall be fed from the lighting panel that feeds the lights in that area; 7) a breaker lock is required on the breaker that controls the circuit that feeds the emergency battery unit; 8) correct wiring at service and sub-panels; 9) cannot have lighting on receptacle circuits; 10) upstairs locked at time of inspection; 11) must check show cases and equipment when installed; and 12) protect floor receptacles.

(95) After receiving the violations cited during the March 17, 1982, electrical inspection, Wisner contacted Jack Shoultes and Terry Whitman for authorization to proceed with the work. Whitman told Wisner that he did not want to spend more money at that time and told Wisner to discontinue the work. Wisner was subsequently told to discontinue work at the I–69 store in Charlotte.

(96) On October 1, 1982, Nielson sent Wisner an inquiry about the status of the electrical work at 5583. Nielson testified that his correspondence to Wisner was prompted by the fact that nearly six months had elapsed since any activity on the permit, and after six months of inactivity the permit would expire under the Warren Electrical Ordinance Upon receiving the letter, Wisner called Whitman again and·asked him if he should proceed with the work, but Whitman said "no." Wisner responded to Nielson's letter on October 31, 1981, explaining to Nielson that the owner of the property asked him to discontinue work on the property until further notice.

(97) Wisner testified that the majority of the March 17, 1981, violations cited by Nielson were not unreasonable. He indicated that although some were more common than others, he was familiar with each of the cited violations. He did state that it was unusual to request a riser diagram and load calculation for an existing building, but noted that Nielson may have requested them because the several meters in the service area had to be paired down to the first floor. Wisner noted that the inspection was a "rough inspection" and that it was not uncommon to have to remedy minor violations. Wisner stated that most of the violations cited by Nielson were, in fact, minor in nature and that it would only cost about $1,500.00 to remedy them.

(98) Roberts Electric was subsequently retained but did not secure an electrical permit until June 4, 1983. Robert Poirer of Roberts Electric testified that he worked one and one half days at 5583, receiving instructions from his father, the owner of Roberts Electric, to correct violations. He was not given the list of violations. Poirer went upstairs to check for any hazards and discovered wires hanging out of the walls and ceilings. He moved debris away from the service panel, rehung an exit light, replaced covers and removed exposed wires. Poirer was called off the job by his father and to his knowledge no inspection was ever conducted on the permit secured by Roberts Electric.

### D. *1983 Mayoral Race*

(99) In the fall of 1983, the banning of "pornographic" businesses became an issue of public concern, as well as a campaign

issue in the mayoral race between incumbent Randlett and challenger Floyd Underwood, a Warren City Councilman. The Northeast Warren Homeowners Association (NWHA) became actively involved in a movement to ban adult uses from the City of Warren. Of special concern was the proposed use at Thirteen Mile Road located in the northeast section of the City. The South Homeowners of Warren (SHOW) was initially founded for the specific purposes of attempting to keep an adult business from opening at 5583. Both organizations conducted weekly meetings devoted to promoting awareness of the anti-pornographic movement and advancing various methods of regulating and banning adult businesses from the City. Both organizations sponsored peaceful demonstrations in front of the proposed locations and were active at City Council meetings during which the zoning ordinance was considered. Despite pressure from SHOW, NWHA, and Randlett, the City Council declined to amend section 14.02 of the zoning ordinance to make it more restrictive.

(100) The evening Magistrate Harvey Walker recommended to this Court in *15192 Thirteen Mile Road* that section 14.02 of the zoning ordinance was unconstitutional, between 500 and 1000 residents attended an informational meeting sponsored by NHWA at a local junior high school. Randlett attended the meeting and issued his assurances that the City would continue to enforce its zoning laws and would file objections to Walker's recommendations. A few days later Randlett was quoted in the press that he had put his staff to work stepping up his promise to "rid the city of this pornographic garbage." He also indicated that he was going to appoint Warren Police Commissioner Edward Edwardson to head a task force to fight the pornography industry.

### E. The Fire At 5583

(101) On November 29, 1983, a fire occurred at the premises. Whitman and his attorney at the time, Gregory Lord, called in the Michigan State Police Arson Strike Force because they did not trust the Warren Fire Department. Both the Michigan State Police and the Warren Fire Department reached the same conclusion—arson by an unidentified individual.

The fire originated on the second floor and burned downward to the false ceiling area below. The only structural damage appeared to be to several of the second floor joists. The first floor sustained only smoke damage. Immediately following the fire, a stop-work order and notice of condemnation were placed on the building.

(102) Following the fire, attorney Barbara Lassen (wife and law partner of attorney Lord) advised the building department that fire repairs would be made as soon as the insurance claim was paid. At the time of trial, the insurance claim was still unpaid and the subect of pending litigation in state court.

(103) On May 12, 1984, Ketchum was sealing the windows with brick and mortar to make the building safe when he was advised by Gower that he needed a permit to do the work. He obtained a permit that day and completed the job.

(104) A petition dated August 21, 1985, requesting a nuisance abatement was filed by surrounding homeowners with the City Clerk. An administrative hearing was conducted on January 23, 1986, as part of the nuisance abatement procedure. George Bruggeman, who usually acts as hearing officer, excused himself after plaintiffs' counsel, Mr. Brussow, questioned Bruggeman's impartiality. Assistant Director of the Department of Public Services Frederick Gimmell conducted the administrative hearing in place of Bruggeman; no evidence was introduced that plaintiffs claimed Gimmel was partial. At such an administrative hearing, the property owner is given the opportunity to cross-examine or question the City officials/employees; Ketchum, who was at the hearing, confirmed that such questioning was conducted by Mr. Brussow.

(105) Following the administrative hearing, Gimmell decided that the matter should be forwarded to the City Council for a public hearing. Attorney Brussow did not receive formal notification of Gimmel's decision until May 15, 1986. On April 22,

1986, Bruggeman wrote to the Director of Public Services at that time, Robert George, conveying Gimmel's decision and recommending that the nuisance abatement proceedings be reactivated because they had heard nothing from Christy's attorney.

(106) The City Council considered the nuisance abatement on July 22, 1986. Both Christy and Whitman appeared before the City Council to oppose the nuisance abatement with their attorney. The City Council's procedures do not permit property owners or their counsel to question citizens during the Council meeting; all comments must be directed to the chairperson.

The City Council voted unanimously that 5583 was a nuisance. The resolution issued allowed the property owner 30 days to correct the conditions constituting a nuisance. The decision to abate the nuisance by the City Council on July 22, 1986, was approximately eleven months after the neighbors filed their petition with the City Clerk. Bruggeman testified that this was an extremely slow nuisance abatement procedure.

(107) After the hearing abating the building at 5583 as a nuisance, plaintiffs' filed an action in the Macomb County Circuit Court seeking relief from the City Council's decision. Named as defendants were Mayor Bonkowski, Bruggeman, the City of Warren and the City Council. In the complaint plaintiffs alleged a procedural due process claim under the United States Constitution, as well as several state law claims.

(108) Judge Deborah Servitto, former Assistant City Attorney, testified that shortly after the suit was filed, it was discovered that the failure to provide notice to the mortgagee, B & B Management, rendered the nuisance abatement proceedings void and that she communicated this to plaintiffs' counsel, Mr. Brussow, in writing. Mr. Brussow subsequently confirmed this in writing in his correspondence dated May 9, 1987.

(109) On May 12, 1987, Judge Bruff entered an injunction restraining defendants from removing or damaging the building at 5583. The injunction was based on Judge Bruff's statement that the parties had agreed the procedure engaged in by defendants to abate plaintiffs' property was defective "and that to permit the defendant to proceed against the plaintiffs' property would cause irreparable harm." The order concluded, "THIS INJUNCTION IS A FINAL JUDGMENT CONCERNING ALL MATTERS IN THIS CASE."

F. *Other Proposed Adult Businesses*

(110) Testimony was presented by plaintiffs concerning the City's treatment of other proposed adult businesses in Warren. One such business, Adult Bookworld, was the first adult business to locate in Warren; it was located at 22957 Van Dyke and received a certificate of reoccupancy on June 12, 1971. Sometime in the late 1970's, the City determined that it was necessary to widen Nine Mile Road at the intersection of Van Dyke to allow left-bound turns. On February 7, 1978, the City Council passed a resolution declaring it necessary to take several locations, including 22957, in order to expand Nine Mile.

(111) The owners of Bookworld proceeded to procure the building and land at 20828 Van Dyke, which at the time complied with the Warren zoning ordinance; it did not comply, however, with the 500–foot provision of ordinance No. 30–573 which became effective January 17, 1979. After being notified by the City that it had to vacate the premises, the owner of Bookworld filed a motion to stay the eviction and requested an order compelling the City to assist the Bookworld owners in finding a new location pursuant to Mich.Comp. Laws Ann. § 213.323(1)(f) (West 1985). For reasons not apparent from the court records entered into evidence in this action or the 22957 or 20828 building files, the City agreed to allow Bookworld to remain at 20828 even though it is within 500 feet of a residential use. The 20828 building file indicates that after a series of electrical violations were remedied, a certificate of occupancy was issued on December 21, 1982.

(112) Another adult business was proposed at 4061 Eight Mile Road by John Vallone. Excerpts from the building file

were introduced into evidence. A letter from Nielson to Bruggeman dated August 26, 1983, indicates that Nielson and a representative of the Police Department checked on a complaint that work was being done at 4061 Eight Mile without permits. Nielson stated that they found the construction of approximately 26 booths and other interior alterations in progress. He further stated that the booths had coin-operators installed and wiring for other equipment which was to be installed later. Mr. Vallone was asked if he had permits for the work. He stated that his attorney was in the process of obtaining the permits. Mr. Nielson then issued violations and stop-work orders were posted. They agreed to leave at Mr. Vallone's request once Mr. Vallone agreed to put the tools away.

On the same day, August 26, 1983, Bruggeman issued an inter-office memo to all personnel in the building department, apprising them that a stop-work order had been placed on the building at 4061 Eight Mile Road and that no building permits were to be issued or inspections made relative to the property without approval by Bruggeman.

(113) Although no electrical permit was introduced into evidence, an electrical inspection was apparently carried out by Mr. Nielson on August 31, 1983. In a letter dated September 1, 1983, to Vallone, Nielson cited the existence of 22 violations.

(114) The excerpts of the file introduced into evidence contained a copy of the routing slip used to review plans submitted by Vallone. The copy indicates that each of the departments rejected the plans. The plans were rejected and returned to Vallone in a letter from zoning inspector Weckesser dated September 27, 1983.

(115) On September 23, 1983, Bruggeman sent Servitto a letter updating him on the construction at 4061 Eight Mile Road. He indicated the following: (1) construction had commenced without building permits necessitating the posting of stop-work orders on August 26, 1983, and again on August 29, 1983; 2) Vallone applied for a building permit and submitted plans and specifications on September 21, 1983; 3)

Bruggeman had monitored the daily activity of 4061 and it appeared that work was being completed before permits had been issued by virtue of the fact that entry could not be gained into the building because the front and rear doors were locked and no occupancy notices, as well as the stop-work orders had been removed for the third time.

(116) On September 27, 1983, Bruggeman sent Vallone a letter asking him to acknowledge his communique as the last and final request to halt all further construction at 4061 Eight Mile until the proper building permit had been issued. He further stated that the building department records indicated that three stop-work orders had been issued, one on August 26, 1983, one on August 29, 1983, and the third one on September 27, 1983.

Servitto testified that sometimes after the September 23, 1983, letter from Bruggeman, the two went to 4061 and together posted the third stop-work order.

(117) Sometime after the third stop-work order was posted, an altercation between Vallone and the building department officials took place. Bruggeman was on his way to work when he passed the rear entrance of 4061 and noticed the construction of what looked like a canopy over the door. Vallone was on the premises at the time and testified that a carpenter employed by the landlord was attempting to "fix a sliding steel door."

As Bruggeman pulled up to the entrance he radioed Servitto for assistance. Servitto testified that when he first arrived, he told the construction worker to put his tools away or "he'd burn him," meaning he'd have his license revoked. A heated confrontation ensued between Vallone, Servitto and Bruggeman. Randlett also arrived. Randlett testified that he heard Bruggeman's call to Servitto and thought he could be of assistance.

Vallone testified that he became fearful and called his attorney Gregory Lord. Lord eventually arrived and the two eventually left by another entrance.

(118) Vallone also testified concerning another location at 4069 Eight Mile Road which he intended to use as a normal retail store. He stated that he was required by the building department to sign a document promising not to sell adult material. He testified that he applied for reoccupancy inspections, the inspectors came, and he received the violations. He allegedly hired contractors to obtain the necessary permits, but the building department refused to issue them. Vallone testified that he went down to the building department and talked to Bruggeman himself, but Bruggeman would not tell him why the permits were not granted. He apparently received some permits, however, because he testified that some work had been done and new violations were cited. Vallone never opened the store at 4069 Eight Mile Road.

(119) Finally, evidence was introduced pertaining to the pulling of a building permit at 15192 Thirteen Mile Road. Lawrence Young, the zoning inspector who reviewed the permit, testified that although he could not remember why, he had intended to deny the permit because the building was going to be used for an adult business and that approval by the Planning Commission was necessary before he could give his approval. He further testified that although he was advised to approve it, he thought he had rejected it.

(120) An article printed in *The Macomb Daily* on October 22, 1983, however, indicated that Young had sent Vallone, a shareholder of the proposed adult bookstore, a letter approving the permit application at the advice of Assistant City Attorney Dalenberg. The article quoted Servitto as stating that the permit was granted while Bruggeman was away and that Bruggeman had reviewed the decision and decided to override it. No explanation for overturning the application was cited, although the article did state that Servitto said the decision to rescind the permit would stand until it could be clarified whether an adult use was planned.

Servitto testified that he was alerted by Bruggeman when he returned from vacation that two permit applications had been filed for 15192, one by Vallone and the other by a Chinese restaurant. Servitto agreed with Bruggeman's decision to pull the permit until the confusion could be settled. Servitto also acknowledges that there was some confusion in the building department as to whether the proposed bookstore would fall under section 14.02 of the zoning ordinance.

### G. *Damages*

(121) Expert testimony was presented by both parties concerning estimated lost earnings allegedly sustained by plaintiffs as a result of not opening their store at 5583. Plaintiffs' expert, William King, Ph.D., was retained two days prior to the most recently scheduled trial date (May 17, 1988, although the case was previously scheduled in September 1987). Defendants' motion *in limine* to exclude plaintiffs' expert was denied; defendants were allowed to take the deposition of plaintiffs' expert during trial and to retain their own expert during trial.

(122) Mr. King holds a Ph.D. in economics from Michigan State University and has performed four business valuations, two of which were for Christy and Whitman. Mr. King issued a report in this matter dated May 26, 1988, in which he determined that a typical video store which opened on January 1, 1980, would, as of May 26, 1988, have suffered a "total lost earning capacity" of $207,285.00.[15] Mr. King testified that he felt "comfortable" with this figure and that he had visited the location and considered the "drive-by" and saw no reason why Christy's store would have been a regular video store.

(123) Defendants' expert, Orville B. Lefko, holds an M.B.A. degree from the Univ-

---

**15.** Mr. King actually issued two reports in this matter; the May 26, 1988, report and a revised report on June 7, 1988, estimating lost earnings at $571,902.00. Mr. King indicated that he had compiled the new report to reflect new data, but rejected the second report as "unreasonably high." The new data was a 24.3% pre-tax profit margin for 1986 based on a survey Mr. King described as unreliable. Defendants' expert, Mr. Lefko, testified that he did not analyze the June 7, 1988 report because Mr. King did not rely on the report himself.

ersity of Michigan, is a C.P.A. and a C.F.A. (Chartered Financial Analyst). His practice for the past twenty years has been exclusively in the field of business valuations. Mr. Lefko has been appointed as an umpire in federal and state courts to do business valuations and is quoted and listed as a source in two texts acknowledged by Mr. King to be authoritative in the field of business valuations. Mr. Lefko testified that he did not have sufficient time to perform his own independent analysis, but instead used the typical video store model developed by Mr. King and critiqued Mr. King's analysis. The major flaw in Mr. King's report according to Mr. Lefko was the omission of the cost of rental tapes as a product cost. Lefko testified that Mr. King's report considered only the cost of purchasing tapes to be sold and not the cost of the rental tapes. Plugging what he considered to be a proper estimation of the cost of rental tapes into Mr. King's model, Mr. Lefko determined that the business would have lost approximately $128,000.00 over the eight-year period. Mr. Lefko also testified that there were several general reasons which led him to believe that the business would not be successful.

(124) The Court concludes similarities between Mr. King's typical video store and the store Christy intended to open are at best, strained, and that the $207,285.00 figure projected by King is overly optimistic. Upon review of the testimony of both King and Lefko, the Court finds that the total lost earning capacity from plaintiffs' business at 5583 E. Eight Mile during the period from January 1, 1980, until May 26, 1988, would not have exceeded $100,000.00

## CONCLUSIONS OF LAW

### A. *Motion to Dismiss*

■ (1) When a district court reserves judgment on a defendant's motion to dismiss under F.R.Civ.P. 41(b) at the close of plaintiff's case, the court must consider all the evidence in deciding the motion. *A.P. Hopkins Corp. v. Studebaker Corp.*, 496 F.2d 969, 971 (6th Cir.1974); *ABN Club v. Great Amer. Insurance Co.*, 404 F.2d 100, 103 (6th Cir.1968). Additionally, when rul-ing on a Rule 41(b) motion, a court is not to make any special inferences in the plaintiff's favor. Instead, it is to weigh the evidence, resolve any conflicts in it, and decide for itself where the preponderance lies. C. Wright & A. Miller, *Federal Practice and Procedure* § 2371, at 224–5 (1971); *Kitchen v. Chippewa Valley Schools*, 825 F.2d 1004, 1014–18 n. 6 (6th Cir.1987); *Hersch v. United States*, 719 F.2d 873, 876 (6th Cir.1983).

(2) Because in reviewing plaintiffs' motion the Court must consider all the evidence and the standard of review is the same standard the Court must employ in ruling on plaintiffs' claims not subject to defendants' motion, the Court will consider the issues raised by defendants in reviewing the claims alleged by plaintiffs

### B. *Standing*

■ (3) Before reaching the merits, the Court must determine whether plaintiffs have standing to challenge the actions of defendants under the Constitution. *Planned Parenthood Ass'n v. City of Cincinnati*, 822 F.2d 1390, 1394 (6th Cir.1987) (citing *Warth v. Seldin*, 422 U.S. 490, 498, 95 S.Ct. 2197, 2204, 45 L.Ed.2d 343 (1975)). Defendants contend neither Christy nor Newsreel Services is the proper party to bring this action and that they therefore lack standing. Defendants strongly maintain that the evidence introduced at trial shows that Whitman was and is, for all practical purposes, the owner of the building at 5583, and that Christy's involvement was merely part of Whitman's overall strategy of engaging in deceptive practices to facilitate the opening of adult businesses.

(4) The Sixth Circuit succinctly summarized the analysis utilized in determining whether a plaintiff has standing in *Planned Parenthood:*

> Examination of the standing issue involves two levels of inquiry. The first is of a constitutional dimension and involves determining whether the plaintiff has shown that a "case or controversy" exists between the parties as defined by Article III. *Singleton v. Wulff,* 428 U.S. 106, 112 [96 S.Ct. 2868, 2873, 49 L.Ed.2d

826] (1976); *Warth* [*v. Seldin*] 422 U.S. [490] at 498 [, 95 S.Ct. 2197 at 2204, 45 L.Ed.2d 343]. This can be accomplished by proving an actual injury or injury in fact which is "likely to be redressed by a favorable decision." *Simon v. Eastern Kentucky Welfare Rights Org.*, 426 U.S. 26, 38 [, 96 S.Ct. 1917, 1924, 48 L.Ed.2d 450] (1976). The second inquiry involves considering whether, as a prudential matter, the plaintiff is the proper proponent of the rights on which the action is based. *Singleton*, 428 U.S. at 112 [, 96 S.Ct. at 2873]. *See also Virginia v. American Booksellers Ass'n.*, —— U.S. ——, 108 S.Ct. 636 [, 98 L.Ed.2d 782] (1988).

Although the question is a close one, the Court concludes that plaintiffs have suffered actual injury as a result of the alleged unconstitutional conduct of defendants, and thus satisfy the first inquiry. The relevant question in determining whether plaintiffs suffered injury in fact is not, as is typically the case, whether any injury actually occurred or was threatened; someone, regardless of who it was, has allegedly been unable to open 5583 for business and has thus lost the opportunity to operate a successful business. The appropriate question is whether the injury should be attributed to Whitman or plaintiffs.

(5) Having characterized the first inquiry in this fashion, sufficient evidence was introduced which might lead one to believe that Whitman was, in fact, the key player in the effort to open the store at 5583. Although Christy's name appeared on the lease and deed, the down payment, lease payment, mortgage payments, attorney fees, costs of remodeling, utilities and insurance were paid by Whitman until mid–1984. The building was located by Lippman, an associate of Whitman's. Whitman hired the contractors and determined what remodeling would be conducted.

Whitman's explanation that he was attempting to open the store for Christy to satisfy his debt to her is somewhat suspect because of the apparent nonexistence of any written agreement between the two, and perhaps more importantly because of their lack of concern over the need to reduce the alleged agreement to writing. Additionally, Whitman continued to provide substantial assistance to Christy in establishing the stores presently operated by Newsreel Services, and has also underwritten much of the litigation costs incurred by Christy in legal battles with various other cities over the opening of her stores; yet Christy testified that Whitman's financial assistance relative to these other stores was not considered repayment of the amount allegedly owed her by Whitman. Both Whitman and Christy testified that they are unsure whether Whitman still owes Christy any money at all, although they plan to discuss it in the future.

Compounding the suspicious nature of the alleged agreement is the convoluted nature in which the interests of Newsreel Services overlap with that of Whitman's various corporations. Whitman's home where he and Christy reside and the warehouse, located just behind his house, serve as the "nerve center" of both Whitman's and Christy's operations. The house, warehouse, and stock contained in both the house and warehouse are owned by Whitman. Newsreel Services, however, which apparently operates out of Whitman's house and warehouse, runs the warehouse and distributes the stock. Newsreel Services employs a "road crew" which services not only Christy's stores, but also Whitman's. Whitman is not charged for this service. Finally, Whitman and Christy are actively involved with various aspects of the other's stores, but no agreements between the two have been reduced to writing.

Notwithstanding this evidence, there is no evidence to indicate that Christy does not benefit from the profits earned by the stores run through Newsreel Services. Rather, she testified she receives a salary from Newsreel Services. Although Whitman financed the activity surrounding 5583 until mid-July 1984, Newsreel Services began making the mortgage payments once Christy's store on I–69 opened, and paid off the $5,000.00 balloon payment in July 1988.

There is no reason to believe that any profit which would have been earned by a store at 5583 would not have been retained by Newsreel Services and passed on, at least in part, to Christy. Thus, regardless of whether Christy is, as she contends, the sole principal behind Newsreel Services, or, as the defendants contend, merely a player in Whitman's "scheme of deceit," she has been injured as a result of the store at 5583 not opening.

(6) Having determined that plaintiffs have met the first inquiry, it is clear that they are the proper proponent of the rights on which this action is based. They rely not on the right of others, but upon their rights under the first, fifth and fifteenth amendments.[16] Plaintiffs thus have standing to bring this action.

### C. Individual Defendants: Bruggeman and Servitto

(7) Throughout their pleadings and during the course of the trial, plaintiffs have propounded the theory that Bruggeman, a pervasive influence in the City's building department, conspired with building department employees and his superior Public Service Director Servitto, to further the announced policy of Mayor Randlett to rid the City of pornography. Plaintiffs claim that Bruggeman, at the direction of Servitto, implemented the Mayor's directive with respect to 5583 by manipulating the City's ordinances and the various trade codes in order to preclude Christy from obtaining the permits necessary to open her business and in attempting to abate the building as a public nuisance.

### 1. Bruggeman
### FIRST AMENDMENT

(8) The main thrust of Christy's case is the contention that Bruggeman and the building department's actions encroached upon her right to disseminate various categories of protected speech ranging from political to sexually explicit, thus constituting a prior restraint under the first amendment.

There is no contention by defendants that the videos Christy testified she originally intended to sell or the "adult" materials she later decided she would carry would be obscene or outside the protection of the first amendment. Merely because plaintiffs' intended speech is protected by the first amendment does not mean, however, that the City lacks power to regulate that speech. As the Supreme Court noted in *Young v. American Mini Theatres*, 427 U.S. 50, 62, 96 S.Ct. 2440, 2448, 49 L.Ed.2d 310 (1976). "The mere fact that the commercial exploitation of material protected by the First Amendment is subject to zoning and other licensing requirements is not a sufficient reason for invalidating these ordinances." It can not be seriously questioned, for example, that the BOCA Code's provisions requiring building permits and certificates of occupancy are unconstitutional merely because they have the effect of regulating businesses such as plaintiffs' which engage in the sale of speech protected by the first amendment.

(9) The power to regulate protected expression also now includes, of course, the right to limit the location of businesses which sell sexually explicit material. In *Young*, the Court was called upon to rule on the constitutionality of the City of Detroit's zoning ordinances which prohibited an adult theatre from locating within 1000 feet of any two other regulated uses or within 500 feet of any residential zone. Although the majority of the Court upheld the regulation, the Justices could not agree on a single rationale. Indeed, this Court, in *15192 Thirteen Mile Road* found the provisions of the City of Warren's zoning ordi-

---

**16.** Plaintiffs also satisfy the other prudential considerations articulated by the Supreme Court; the issues raised in this action do not constitute only " 'abstract questions of wide public significance' which amount to 'generalized grievances,' pervasively shared and most appropriately addressed in the representative branches," and fall within " 'the zone of interests to be protected or regulated by the statute or constitutional guarantee in question.' " *Valley Forge College v. Americans United for Separation of Church and State*, 454 U.S. 464, 475, 102 S.Ct. 752, 760, 70 L.Ed.2d 700 (1982) (quoting *Warth v. Seldin*, 422 U.S. 490, 499, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975), and *Ass'n of Data Processing Services Orgs. Inc. v. Camp*, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970)).

nance precluding adult businesses from locating within 500 feet of a residential use or an area zoned residential and from 1000 feet of another adult business, church or school to be a constitutionally permissible form of regulation under *Young.*

Less than two months after the Court issued its opinion, the Supreme Court issued its decision in *City of Renton v. Playtime Theatres, Inc.,* 475 U.S. 41, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986). Relying in part on *Young,* the Court upheld a zoning ordinance enacted by Renton, Washington that prohibited adult motion picture theaters from locating within 1000 feet of any residential zone, single or multiple-family dwelling, church, park, or school. The Court found the regulations to be a permissible time, place, and manner regulation because it was content neutral, designed to serve a substantial governmental interest, and did not unreasonably limit alternative avenues of communication.

(10) Notwithstanding Warren's ability to issue permits and certificates of occupancy under the BOCA Code despite the incidental effect on businesses disseminating speech protected by the first amendment, the building department officials may not issue violations or deny permits or certificates of occupancy based on the content of speech proposed to be sold at the premises. *Police Dept. of Chicago v. Mosley,* 408 U.S. 92, 98–99, 92 S.Ct. 2286, 2291–92, 33 L.Ed. 2d 212 (1972) (regulations enacted for the purpose of restraining speech on the basis of its content presumptively violate the first amendment). Neither may building department officials discriminatorily apply certain provisions of the City's ordinances and adopted codes to an owner who they believe intended to sell material containing sexually explicit fare that would not normally be applied to other owners. *E–Bru Inc. v. Graves,* 566 F.Supp. 1476, 1480 (D.New Jersey 1983) (facially valid regulatory scheme may not be selectively applied to deprive plaintiff of the right to exercise fundamental constitutional freedoms).

(11) In determining whether Bruggeman is subject to liability for Christy's alleged inability to open her store, the conduct of the other building department officials underneath Bruggeman's supervisory control must also be considered. Although Bruggeman may not be held liable under the theory of vicarious liability or *respondeat superior,* he can be found liable for an unconstitutional act of an employee under his supervision if he implicitly authorized, approved or knowingly acquiesced in the offending conduct. *Alioto v. City of Shively,* 835 F.2d 1173, 1175 (6th Cir.1987); *see also Hays v. Jefferson County,* 668 F.2d 869, 874 (6th Cir.1982), *cert. denied,* 459 U.S. 833, 103 S.Ct. 75, 74 L.Ed.2d 73 (1983).

(12) The incidents which plaintiffs rely upon in support of their claims occurred primarily during the period of time beginning in May 1980, when electrical inspector Nielson first inspected the building, and ending in June 1983, when Roberts Electric worked on the electric system. Despite plaintiffs' contention to the contrary, the Court concludes that neither Bruggeman or the other building officials acted to preclude plaintiffs from opening their store, or discriminatorily applied provisions of the City's ordinances and codes merely because of the content of the material they believed Christy intended to sell.

(13) At the outset, the Court notes that the failure to obtain a certificate of occupancy for 5583 was primarily due to plaintiffs' own inactivity. The evidence introduced at trial indicates that at least up until the second meeting between Christy and Bruggeman in November 1980, any delays were attributable to Christy and Whitman. Despite the violations issued by the inspectors during their June 17 inspection and the stop-work order posted by Bruggeman shortly after the June 17, 1980, inspection, neither Christy or Ketchum contacted the building department to inquire about the stop-work order or obtain permits to remedy the violations.

The stop-work order did not preclude the pulling of any permits necessary to remedy any existing violations. Rather, Bruggeman testified that one of the reasons the stop-work order was posted, consistent with prior practice, was to bring to a halt

work which he thought required a permit, but for which no permit was pulled. Had a proper permit been obtained, the stop-work order would have been lifted. Ketchum conceded that he did not apply for any permits to remedy the violations immediately after the inspection because he had not been told to do so by Christy or Whitman. Christy or Whitman also did not apply for any permits.

When no one contacted the building department to inquire about the stop-work order, Bruggeman took the initiative to contact Christy himself. His repeated attempts to reach her at the number listed on the application were unsuccessful; although he left his name and number, Christy waited five weeks before she decided to return his call. When at last they met in late July, Bruggeman did not indicate that she would be precluded from applying for a permit. Even according to Christy's account of what was said at the meeting, Bruggeman did not tell her that any application for permits would be denied; she merely testified that she left the meeting under the impression that she would be unable to open her store. Thus no evidence was introduced which shows that Bruggeman himself in any way delayed Christy from opening her store up through the November 1980, meeting. Rather, it is clear that Christy was responsible for the delay because she failed to obtain the proper permits in order to remove the violations.

(14) Whitman and Christy's conduct prior to the November 1980, meeting was typical of their conduct during the entire three-year period. For example, the electrical violations cited on June 17, 1980, still existed nineteen months later on January 13, 1982, when the second reoccupancy inspection was called. An electrical permit was not secured until January 26, 1982. The violations cited by Nielson on March 17, 1982, were never corrected. Wisner was instructed by Whitman not to correct violations because Whitman didn't want to spend any more money. Although Wisner was replaced by Roberts Electric in January 1983, a permit was not secured until

June 1983. No inspection was ever conducted.

Attempts to remedy the building violations were equally sporadic. Even after the permit was issued on July 30, 1981, Ketchum did not call for an inspection until August 30, 1981. Although Gower was unable to conduct the inspection because the plans were not on the premises as required, Gower told Ketchum to call again for an inspection when the plans were there. Ketchum did not call for an inspection until January 13, 1982, when he requested a reoccupancy inspection. The violations cited by Gower were based upon requirements which Johnson had written on the plans which Ketchum had not addressed. No further inspection was ever called.

Finally, although heating inspector Henry indicated on February 22, 1981, that a contractor should inspect the boiler and a letter of verification sent to the building department, no such letter was in the building file. Henry was not recalled until the reoccupancy inspection on January 13, 1982. The boiler was not functioning, and Henry informed Ketchum that the heat exchanger needed to be checked by a contractor. No further inspection was called.

In short, although plaintiffs attempted to lay the burden of the delays on defendants, it is apparent that the substantial delays in the remodeling and other work which occurred at 5583 were largely attributable to Christy and Whitman.

(15) In addition to the fact that the delays were caused by Christy and/or Whitman, the Court had an extended opportunity to observe not only Bruggeman, but also several of the inspectors on the witness stand during the course of the trial. The Court found from their testimony that they had no desire to foreclose Christy from the use of her store because of any personal dislike for the material she might sell to be convincing.

(16) This conclusion is not belied by the conduct of Bruggeman or other building department officials. Ignoring for the moment the period of time between the November 1980, meeting of Christy and

Bruggeman and the issuance of the permit on July 20, 1980, There is no evidentiary support for the contention that Bruggeman himself took any action to delay or deny Christy's use of the building, or that he implicitly authorized or knowingly acquiesced in such conduct by any of his subordinates. There is no evidence that Bruggeman even knew of the June 17, 1980, inspection until after it happened. Although Bruggeman did issue the stop-work order shortly after the June 17, 1980, inspection as already indicated, the stop-work order did not preclude plaintiffs from obtaining a building permit, (or any other permit) but was rather an inducement to obtain one. And again, regardless of whose account of what took place at the first meeting between Christy and Bruggeman, Bruggeman did not tell Christy she could not proceed to obtain a permit. Finally, there is no indication that Bruggeman was in any way involved with the January 13, 1982, inspections; his lack of involvement after the July 30, 1981, letter to Groesbeck is apparent from his request for a status report in October 1982.

(17) Similarly, notwithstanding the activity which took place between the November 1980, meeting and July 30, 1981, the Court believes that the inspectors' conduct during the three-year period in question was not inconsistent with their testimony. Despite the fact that he did not pass his first (and only) inspection, electrical contractor Wisner testified that it was not unusual to have to call several inspections before the inspection would be approved. When the owner in 1976 attempted to secure a certificate of occupancy in April 1976, Gower, then an electrical inspector, rejected the inspection three times and did not approve the work until his fourth inspection. Again, in January 1979, it took the owner four inspections by Carr, also an electrical inspector at that time, to pass the electrical portion of the reoccupancy inspections. The number of inspections required by Gower and Carr in 1976 and 1979 indicates that the fact plaintiffs in this case did not pass the first inspection is by no means unusual, and dispels any notion that violations were manufactured by the inspectors.

It is also less than extraordinary that plaintiffs failed the inspections again on January 13, 1982. No electrical work had been done since the violations had been issued in June 1980. Similarly, the building violations cited by Carr were all related to the notes written on the plans by Johnson. Additionally, Wisner did not find the violations cited by Nielson on March 12, 1982, to be unreasonable. Finally, the Court notes that the fact that one inspector may cite certain violations during an inspection which were not cited in a previous inspection by a different inspector is not immensely helpful in determining whether the violations are reasonable. The inspectors in the building department conduct numerous inspections each day, especially in the spring and summer, and cannot be expected to notice every violation.

In sum, the Court does not believe the evidence gives rise to an inference that the inspections were conducted in such a fashion so as to intentionally deprive Christy of her first amendment right.

■ (18) Slightly more troubling, however, is the conduct which took place between the November 1980, meeting and the issuance of the building permit on July 20, 1981. Bruggeman explicitly indicated in his July 30, 1981, letter to Chief Grosbeck that the building department had delayed issuance of Ketchum's May 18, 1981, permit application based on the assumption that an adult business was being sneaked in along the same lines as the businesses on Van Dyke Avenue. Although Ketchum did not file the application until May 18, 1981, it appears that the delay actually was in force as early as November 1980. Bruggeman testified at trial that he told Swor during his second meeting with Christy that it would take a court order before he would permit any further work on the premises. Thus, for purposes of establishing the period of time Christy was delayed a permit, it appears that Christy was foreclosed from obtaining any type of permit as early as November 17, 1980, the date of the second meeting.

(19) Having established the time of delay to be from apparently November 17, 1980, until July 20, 1981, whether the delay violates the first amendment must be considered. Plaintiffs would have the Court believe that Bruggeman violated their first amendment right merely because Bruggeman's decision to delay the permit was motivated by the desire to ensure that an adult business was not "sneaked in." Initially, plaintiffs' argument appears irrefutable. Upon further examination, however, Bruggeman's rationale is perfectly justifiable as an attempt to enforce the 500–foot location requirement contained in section 14.02 of the Warren zoning ordinance.

(20) The City's zoning ordinance, which, of course, is a time, place and manner regulation, precludes the location of an adult use within 500 feet of an area zoned residential or a residential use. The parties have stipulated that the building at 5583 is within 500 feet of a residential zone; consequently, the building may not be used for an adult use. Accordingly, Bruggeman's desire to preclude an adult use from opening at 5583 may be justifiable if it is nothing more than an effort to enforce the 500–foot location requirement. If such were the case, the focus on the intended speech would be necessary in order to determine whether the location restriction is applicable. Application of the ordinance depending upon consideration of the content of the speech itself has been explicitly approved in *Young*, and *Renton;* it is permissible because the regulation of the location of businesses which disseminate sexually explicit speech is directed at curbing the secondary effects of such speech and not at controlling the content of the speech. *Young*, 427 U.S. at 71, 80–81, 96 S.Ct. at 2452, 2457–58; *Renton*, 475 U.S. at 46–47, 106 S.Ct. at 928–29.

As before, the Court does not believe that Bruggeman purposefully acted to foreclose Christy from disseminating sexually explicit speech merely because he found it personally distasteful. Both his testimony and the evidence introduced at trial lead the Court to believe that he delayed issuing the permits because he believed the premises might have been used as an adult use in violation of the 500–foot location requirement. Thus, Bruggeman's delay of any permits was a proper and constitutionally permissible means of enforcing the 500–foot location requirement. In any event, to the extent any unconstitutional motive did exist, it was not a "substantial factor" in the absence of which the opposite decision would have been made. *Mt. Healthy City Bd. of Educ. v. Doyle*, 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977); *Amico v. New Castle County*, 101 F.R.D. 472, 491 (D.Dele.1984).

(21) Notwithstanding the proper motive of Bruggeman, the Court is troubled by the *effect* of Bruggeman's assumption that sexually explicit material might be sold. Regardless of his good intentions, regulating speech on the basis of an assumption may lead to an unlawful prior restraint of protected speech. Despite Warren's ability to regulate the operation and location of businesses engaged in the sale of protected speech, application of section 14.02 of the City's zoning ordinance is still governed by the general prohibitions against prior restraints. Zoning ordinances which regulate the location of businesses disseminating sexually explicit speech are just as susceptible as any other time, place and manner regulations containing a licensing scheme to the potential dangers of prior restraints. Although special use approval required under a zoning ordinance is not technically a license, for all practical purposes it is no different than a license since an applicant is unable to use the premises if he is denied special use approval and consequently a certificate of occupancy. *Walker v. City of Kansas*, 691 F.Supp. 1243 (W.D.Miss). The proscriptions against prior restraints applicable to other time, place and manner regulations are, therefore, also applicable to special use provisions in zoning ordinances.

(22) Thus, for example, the procedures contained in a zoning ordinance for determining whether a business falls under a special use provision and must obtain special use approval and whether the approval should be granted run the risk of constituting a prior restraint if they vest an improp-

er degree of discretion in reviewing officials. *See, e.g., City of Lakewood v. Plain Dealer Publishing Co.,* — U.S. —, — — —, 108 S.Ct. 2138, 2143–48, 100 L.Ed.2d 771 (1988); *Shuttlesworth v. Birmingham,* 394 U.S. 147, 151, 89 S.Ct. 935, 938, 22 L.Ed.2d 162 (1969). Indeed, this Court struck down as unconstitutional under *Shuttlesworth* the provisions for special use approval contained in section 14.02 of the Warren zoning ordinance in *15192 Thirteen Mile Road* because they "improperly vest[ed] unbridled discretion in local officials." *15192 Thirteen Mile Road,* 626 F.Supp. at 821. *See also Walker,* 691 F.Supp. 1243 (and cases cited therein). The purpose, of course, for limiting the discretion a reviewing official may exercise in deciding whether to grant a license or special use approval is to avoid the danger of censorship. *Southeastern Promotions, LTD v. Conrad,* 420 U.S. 546, 553, 95 S.Ct. 1239, 1243, 43 L.Ed.2d 448 (1975).

(23) The same danger of censorship which counsels against vesting excessive authority in a reviewing official has also been relied upon by the Supreme Court as sufficient reason to preclude an official from denying an application to speak based on an unfounded assumption that the speech will be unlawful. In *Southeastern Promotions,* the Supreme Court was called upon to determine whether a decision by the directors of a municipal theater in Chattanooga, Tennessee, not to allow the rock musical "Hair" to be performed at the theatre constituted a prior restraint in violation of the first amendment. In order to use the theater, an application had to be filed with the board. For all practical purposes, the board was permitted to make its decision based on the content of the proposed production. The board was empowered to determine whether the application should be granted based on the "appraisal of the facts, the exercise of judgment, and the formation of an opinion by the board." *Id.* at 554, 95 S.Ct. at 1244. The Court concluded that the decision by the board constituted an unlawful prior restraint. Although the Court reviewed its prior decisions striking down as prior restraints licensing regulations which permitted the re-

viewing official too much discretion in deciding whether to grant or deny the application, its decision was based on the fact that the board's denial of the application kept the production off the stage in anticipation of its illegality.

The Board's judgment effectively kept the musical off stage. Respondents did not permit the show to go on and rely on law enforcement authorities to prosecute for anything illegal that occurred. Rather, they denied the application in anticipation that the production would violate the law. See *New York Times Co v United States,* 403 US 713, 735–738, 91 S Ct 2140, 2152–54, 29 L Ed 2d 822 (1971) (White J. concurring.... Denying use of the municipal facility under the circumstances present here constituted the prior restraint.

*Id.* at 553–57, 95 S.Ct. at 1243–46.

(24) Applying the teaching of *Southeastern Promotions* to the facts of this case, the Court concludes that *Southeastern Promotions* is factually distinguishable from this case in several respects. First, this case involves application of a zoning ordinance by a city official charged with the responsibility of applying regulations designed to promote the health, safety and welfare of the community. Although the Supreme Court has stated that "the presumption of validity that traditionally attends a local government's exercise of its zoning power carries little, if any, weight where the zoning regulation trenches on rights of expression protected under the First Amendment," *Schad v. Mt. Ephraim,* 452 U.S. 61, 77, 101 S.Ct. 2176, 2187, 68 L.Ed.2d 671 (1981), (Blackmum, J. concurring), in balancing the City's regulatory interest against the first amendment, the weight attributed to the City's need to enforce the zoning ordinance greatly exceeds the need to monitor the content of a concert.

The two cases are distinguishable in yet another way. The board in *Southeastern Promotions* decided not to permit the play "Hair" based only on prior judgment of the content of the film. *Southeastern Promotions,* 420 U.S. at 554–55, 95 S.Ct. at

1244–45. In this case, however, Bruggeman was substantially certain that premises would be used for an adult business. Bruggeman listed several reasons justifying his belief in his letter to Chief Groesbeck. Primarily, Bruggeman was well acquainted with Lippman's and Whitman's tactics of sneaking in adult uses without permits and certificates of occupancy based on his experience with them at the Van Dyke locations. The remodeling taking place at 5583 looked substantially similar to that which had taken place at the Van Dyke properties. Despite his repeated efforts to contact Christy, she waited five weeks to return his call. When they finally met, Bruggeman claims that she was evasive about the use of the building. At the second meeting, Swor stated that adult material would be sold, although he indicated that he didn't think it would be a sufficient enough amount to bring the store under the ordinance. That Bruggeman's assumption was well-founded is borne out by considering the merchandise of the stores presently operated by plaintiffs. None is a video store; each markets various types of adult oriented products such as women's lingerie, adult books, and "marital aids."

In short, because of the interest asserted by the City in regulating the location of adult uses and the substantial information obtained by Bruggeman, his application of the location requirement based upon an assumption that Christy intended to sell sexually explicit speech did not constitute a prior restraint.

(25) Of course, under *Alioto,* Bruggeman may be liable if he implicitly authorized, deprived, or knowingly acquiesced in the activity of other building officials between November 17, 1980, and July 20, 1981, aimed at suppressing speech based on its content. Although it is clear that the building department officials, namely, Nielson and Johnson, indirectly aided Bruggeman in delaying the permit, for the same reasons stated above the Court believes that the delays were on the whole justified as a means of implementing the location regulation. Additionally, for the reasons stated above, the Court does not believe the delay based on an assumption that speech covered under the adult use provision was going to be disseminated was an unlawful restraint.[17]

For these reasons, plaintiffs cannot prevail on their first amendment claim.[18]

### FIFTH AMENDMENT TAKING

(26) Plaintiffs also allege a taking claim under the just compensation clause of the fifth amendment. Plaintiffs contend that defendants used their municipal power to strip plaintiffs of the entire use of their property. The alleged actions of defendants relied upon by plaintiffs in support of their first amendment claim are identical to those alleged in support of their taking claim under the fifth amendment.

(27) Plaintiffs taking claim must be dismissed because plaintiffs failed to utilize the available state procedures for recovering just compensation for the alleged taking as required in *Williamson Planning Commission v. Hamilton Bank,* 473 U.S. 172, 105 S.Ct. 3108, 87 L.Ed.2d 126 (1985). In *Williamson,* the Supreme Court held

---

**17.** Having determined that no prior restraint existed, the Court need not consider what, if any, procedures are necessary. *See, e.g., FW/PBS, Inc. v. City of Dallas,* 837 F.2d 1298 (5th Cir.1988).

**18.** Closely aligned with its first amendment claim is the contention that the denial of her rights to disseminate protected speech based on her association with attorneys who allegedly represent individuals who disseminate sexually explicit material violates the equal protection clause. The equal protection clause requires that similar individuals be dealt with in a similar manner by the government. Plaintiffs have failed to prove that they were denied the right to disseminate speech because of their association with Lippman, Lord, Swor or Whitman. Rather, as the Court has already held, plaintiffs themselves were primarily responsible for their failure to obtain the necessary permits and the certificate of occupancy. The short delay attributable to the building department did not result because of plaintiffs' association with Lippman, Lord, Swor, or Whitman, but because they believed an unpermitted use was planned for the building at 5583. Plaintiffs' equal protection claim therefore lacks an essential element and must be dismissed

that a realtor's taking claim was premature because the planning commission, which had initially rejected the realtor's preliminary plat, had not "arrived at a final, definitive position regarding how it will apply the regulations at issue to the particular land in question." *Williamson*, 473 U.S. at 191, 105 S.Ct. at 3119. The Court specifically indicated, however, that appeal of the planning commission's rejection to the Board of Zoning Appeals was not required since the Board was empowered only to review the rejection and did not participate in the commission's decision-making. Thus, the Court concluded that although a final decision from the decision-making body is necessary, appeal of the final decision is not required before a taking claim is ripe.

The *Williamson* court also concluded that the taking claim was not ripe because the realtor did not seek compensation through the available state procedures. *Id.* at 194–197, 105 S.Ct. at 3120–22. The Court again found the taking claim premature because it had not been shown that an inverse condemnation proceeding in the Tennessee state courts was unavailable. *See also Four Seasons Apartment v. City of Mayfield Heights*, 775 F.2d 150 (6th Cir.1985) (dismissing taking claim under fifth amendment because plaintiffs failed to use the available state procedures to test their right to just compensation).

(28) As was the case in *Williamson,* the municipal procedures for appeal in this case was remedial in nature; the Building Code Board of Appeals in the City of Warren does not participate in the original decision-making, but only reviews the initial

decision and makes a recommendation to the City Council. The plaintiffs' failure to utilize the City of Warren's municipal procedures for review does not, therefore, as defendants contend, preclude the Court from considering the fifth amendment claim.

Plaintiffs' failure to seek compensation through available state procedures is, however, fatal to their claim. In Michigan, an aggrieved property owner may bring an inverse condemnation action in the Court of Claims. *Biff's Grills, Inc. v. State Highway Commission*, 75 Mich.App. 154, 158, 254 N.W.2d 824 (1977). No evidence was introduced by plaintiffs indicating that an action has been filed in the Court of Claims to recover compensation for the alleged taking of their property. Plaintiffs counsel admitted during closing argument that no action had, in fact, been filed. Accordingly, plaintiffs' claim under the fifth amendment must be denied on this basis.[19] *Executive Art Studio v. Charter Township of Kalamazoo*, 674 F.Supp. 1288 (W.D.Mich. 1987) (dismissal of similar claim based on the holding in *Williamson* ). In any event, having determined that the conduct of defendants was not designed to preclude plaintiffs from using the premises, and that the delay in remodeling and the performance of other work is attributable to plaintiffs and Whitman, plaintiffs were not denied "all or an essential use" of their property under *Amen v. City of Dearborn*, 718 F.2d 789, 796 (6th Cir.1983).

## PROCEDURAL DUE PROCESS

(29) Plaintiffs allege that both the administrative hearings conducted by Mr.

---

**19.** In the Court's Memorandum Opinion and Order issued on April 11, 1988, relative to defendants' motion for summary judgment, the Court held that the holding in *Williamson* did not preclude plaintiffs' taking claim for two reasons. First, the Court found that the state appeal procedures relied upon by defendants in their motion were irrelevant under the Court's analysis in *Williamson.* The conclusion in today's opinion that the plaintiffs need not exhaust municipal procedures before bringing a fifth amendment claim is consistent with that conclusion.

The Court also distinguished the holding in *Williamson* and *McDonald, Sommer and Frates*

*v. County of Yola,* 477 U.S. 340, 106 S.Ct. 2561, 91 L.Ed.2d 285 (1986), on the ground that the plaintiffs in this case claim that there was no legitimate reason for denying them building permits and a certificate of occupancy. Since the issue was not raised by defendants however, the Court intentionally omitted any discussion of the requirement under *Williamson* that an aggrieved property owner should first resort to state procedures to test their right to just compensation before bringing a claim under the fifth amendment. Accordingly, the Court's decision today is not inconsistent with the Court's previous decision denying summary judgment on plaintiffs' fifth amendment claim.

Frederick Gimmel, Assistant Director of the Building Department, on January 23, 1986, and the nuisance abatement hearing held before the City Council on July 22, 1986, violated the guarantees of procedural due process. The parties, however, disagree over the effect of Judge Bruff's May 12, 1981, order. Plaintiffs contend that defendants are collaterally estopped from maintaining that plaintiffs were afforded procedural due process under the doctrine of offensive collateral estoppel enumerated in *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 329, 99 S.Ct. 645, 650, 58 L.Ed.2d 552 (1979). Defendants, on the other hand, contend that plaintiffs are precluded from relitigating the constitutionality of the City's proceedings since this issue was litigated before Judge Bruff.

■ (30) The Court agrees that plaintiffs' procedural due process claim is barred by principles of *res judicata.* Under the doctrine of claim preclusion or *res judicata,* a "final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action." *Guzowski v. Hartman*, 849 F.2d 252, 255 n. 4 (6th Cir.1988) (quoting *Federated Dept. Stores, Inc. v. Moitie*, 452 U.S. 394, 398, 101 S.Ct. 2424, 2427, 69 L.Ed.2d 103 (1981)); *Brookins v. Gen'l Motors Corp.*, 843 F.2d 879, 880 (6th Cir.1987) (per curiam) (quoting *Kremer v. Chemical Construction Corp.*, 456 U.S. 461, 467 n. 7, 102 S.Ct. 1883, 1890–91 n. 7, 72 L.Ed.2d 262 (1982)). Additionally, it is axiomatic that a state court judgment must be given the same preclusive effect in federal court that it would be given in the courts of the rendering state. *Migra v. Warren City School District Bd. of Educ.*, 465 U.S. 75, 81, 104 S.Ct. 892, 896, 79 L.Ed.2d 56 (1984); *Vinson v. Campbell Co. Fiscal Court*, 820 F.2d 194, 197 (6th Cir.1987). The three conditions under Michigan law which must be satisfied before *res judicata* may be invoked to bar further litigation have been frequently recited in this circuit:

(1) the prior action must have been decided on its merits; (2) the issues raised in the second case either were resolved in the first, or, through reasonable diligence, might have been raised and resolved in the first case; (3) both actions involved the same parties or their privies.

*Reithmiller v. Blue Cross & Blue Shield of Michigan*, 824 F.2d 510, 511 (6th Cir. 1987); *see also Brookins*, 843 F.2d at 880.

With respect to the first condition, the previous action was decided on the merits. The order entered by Judge Bruff enjoined the City from destroying, razing, damaging, abating or removing the building at 5583 because the City's proceedings were defective. The order stated, "A FINAL JUDGMENT CONCERNING ALL MATTERS IN THIS CASE." The second condition also is satisfied because plaintiffs' complaint in the case before Judge Bruff alleged a procedural due process claim under the fourteenth amendment. That plaintiffs alleged a procedural due process claim is conceded by plaintiffs by contending that defendants are collaterally estopped from litigating the due process claim. Although plaintiffs did not seek damages but only equitable relief in the first action, the issues of damages could have been raised. That the case may not have been decided based on the procedural due process claim also does not alter the fact that the claim was raised and that plaintiffs already had their day in court.

Finally, both the action before Judge Bruff and this action involve the same parties. The plaintiffs in both cases are Karen Christy and Christy Newsreel Services, Inc. The remaining defendants in this case in which this claim applies are George O. Bruggeman and the City of Warren.[20] Bruggeman was a defendant in the state action. Although in the state action the City of Warren building department was named rather than the City; these two entities should thus be considered, for purposes of these two actions, the same party. Accordingly, the third condition is satisfied.

**20.** Servitto, the other remaining defendant in this case left office in November 1985, which

was before the hearings at issue in plaintiffs' claim.

(31) For these reasons, the Court finds that plaintiffs' due process claims relative to the nuisance abatement proceedings are barred by the doctrine of *res judicata.* The Court need not, therefore, consider plaintiffs' collateral estoppel argument of whether the procedures employed by the City met the requirements of procedural due process.

## RIGHT OF ASSOCIATION; RIGHT TO TRAVEL

■ (32) Plaintiffs next allege that defendants' reliance on plaintiffs' association with Lippman, Whitman, Lord and Swor, all of whom are purportedly associated with the dissemination of sexually explicit speech, as a reason to deny plaintiffs the right to disseminate a variety of speech from the building at 5583 violates their right to freedom of association. Although plaintiffs fail to make the distinction, the right to associate consists of two components: the freedom of private association which is a fundamental element of personal liberty under the fourteenth amendment, and the freedom of expressive association under the first amendment. *Roberts v. United States Jaycees,* 468 U.S. 609, 617–618, 104 S.Ct. 3244, 3249, 82 L.Ed.2d 462 (1984); *see also Bd. of Directors of Rotary Int'l v. Rotary Club of Duarte,* 481 U.S. 537, 107 S.Ct. 1940, 95 L.Ed.2d 474 (1987). Plaintiffs' claim fails under either type of freedom of association because plaintiffs have not been precluded from associating with Lippman, Whitman, Lord or Swor. Plaintiffs' claim rests on the assumption that defendants unconstitutionally denied the the ability to use the building at 5583 to disseminate speech. The Court has already held that plaintiffs first amendment right to free speech was not violated by defendants. Accordingly, plaintiffs can no longer argue that the withholding of their first amendment right because of their association with Lippman, Whitman, Lord or Swor violated their right to associate with those individuals.

(33) Finally, plaintiffs' contention that defendants violated their right to travel under *Shapiro v. Thompson,* 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969) is without merit.

### 2. Servitto

(34) Servitto, like Bruggeman may be held liable not only for any constitutional deprivations he may have caused, but also for any unconstitutional acts of any employee under his supervision if he implicitly authorized, approved, or knowingly acquiesced in the offending conduct. *Alioto,* 835 F.2d at 1175. The Court has already held that Bruggeman and the other building department officials did not violate any of plaintiffs' constitutional rights. The Court also finds that Servitto himself did nothing which rises to the level of a constitutional deprivation. Servitto was not even in office during the periods most of the alleged unconstitutional activity took place. He began his tenure with the City in November 1981, after most of the conflict over the inspections and denial of the May 18, 1981, building permit application took place; he left in November 1984, before the abatement proceedings were initiated. Servitto's undisputed testimony was that he never made any decisions regarding the building at 5583 and was not aware of Bruggeman's July 20, 1981, letter to Chief Groesbeck. Servitto also testified that the inter-office memorandum he issued requesting that he be apprised of any activity involving potential adult uses was similar to other memos he had issued in other situations involving potential legal problems. Finally, Servitto's actions relative to other adult uses are irrelevant, at least with respect to plaintiffs' direct claim against him. For these reasons, the Court concludes that Servitto did not deprive plaintiffs of any constitutional rights.

### D. *Municipal Liability*

(35) In *Monell v. New York City Dept. of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), the Supreme Court held a local government entity may not be sued under section 1983 for an injury inflicted solely by its employees or agents. "[A] municipality cannot be held liable *solely* because it employs a tort feasor—or, in other words, a municipality can-

not be held liable under section 1983 on a *respondeat superior* theory." *Id.* at 691, 98 S.Ct. at 2036. (Emphasis in original). The Court stated that municipal liability under section 1983 can be imposed only where the municipal entity itself causes the constitutional violation.

Although the *Monell* court did not explore the full contours of liability under section 1983, the Court did hold that municipal action taken in the form of written policies or at least decisions adopted and promulgated by a city's lawmakers justify the imposition of municipal liability under section 1983. "Local governing bodies, therefore, can be sued directly under section 1983 ... where, as here, the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulations, or decision officially adopted and promulgated by that body's officers." *Id.* at 690, 98 S.Ct. at 2035.

The Court further held that a governmental custom, described as a permanent and well settled practice which has not received formal approval through the body's official decision-making channels, if responsible for a deprivation of rights protected by the Constitution, also justifies liability under section 1983. *Id.* at 690–691, 98 S.Ct. at 2035–36.

Finally, the Court held that a municipal entity may also be liable for the "edicts or acts" of subordinate officials whose conduct may "fairly be said to represent official policy." *Id.* at 694, 98 S.Ct. at 2037. Relying on this language in *Monell*, the Court in *Pembaur v. City of Cincinnati*, 475 U.S. 469, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986), held that a Hamilton County, Ohio, prosecutor's decision instructing deputy sheriffs attempting to serve capiases at a medical clinic to forcibly enter the clinic, directly caused the violation of the clinic owner's fourth amendment rights. *Id.* at 484, 485, 106 S.Ct. at 1300–01. In a fragmented opinion, a majority of six justices determined that the prosecutor's instruction resulted in action taken pursuant to county policy because the prosecutor was a person authorized to establish policy with respect to the action in question. *Id.* Most

recently, in *City of St. Louis v. Praprotnik*, — U.S. ——, 108 S.Ct. 915, 99 L.Ed. 2d 107 (1988), the Supreme Court held that the identification of policymakers is a question of state law—including local ordinances. *Id.* at —— – ——, 108 S.Ct. at 925–26. The Court also emphasized that only municipal employees who have "final policymaking authority may by their actions subject the government to section 1983 liability." *Id.* at —— – ——, 108 S.Ct. at 922–26.

(36) Before determining if liability may be attached to the City under any of these three theories, it is first necessary to determine exactly who may be construed to be a policymaker under *Monell, Pembaur* and *Praprotnik.* The City Council obviously is a final policymaker. Zoning regulations are adopted by the City Council based upon recommendations from the Planning Commission. Building regulations which generally exist in the form of the BOCA Code, are adopted by the City Council. Decisions regarding building matters are reviewable by the Building Code Board of Appeals which then makes a recommendation to the City Council for final action. Bruggeman, Servitto and Randlett are not final policymakers.

■ (37) Applying these facts to the principles stated above, no evidence was introduced showing that the City Council adopted a policy to deprive plaintiffs of their first amendment rights. Rather, the Council decided not to pass a more stringent zoning ordinance while its present ordinance was the subject of a constitutional challenge despite strong pressure from homeowners groups and many city residents to pass the measure.

(38) Plaintiffs also have failed to establish evidence of a widespread practice or custom to deprive prospective adult businesses of constitutional rights. With respect to the building at 5583, the Court has already held that the building department officials did not conspire to deprive plaintiffs of their constitutional rights. Although irrelevant absent an underlying violation against plaintiffs, in each of the other instances raised by plaintiffs as evidence

**658**

of such a custom, it is apparent that city officials and inspectors were reacting to unorthodox and illegal practices by the prospective adult businesses. At 4061 E. Eight Mile, John Vallone persisted in conducting construction without the proper permits and in the face of stop-work orders. With respect to 15192 Thirteen Mile Road, the owner's attorney admitted in letters that adult books would be sold, and two requests for occupancy of the same small commercial location were simultaneously filed, causing the building official to rescind zoning approval. And at 22630–22644 Van Dyke, Lippman and his contractors misrepresented the use of his businesses—listing "portrait painting" instead of nude body painting and "retail records and tapes" instead of peep shows and adult books. In state court litigation, Whitman admitted that the adult uses did not predate ordinances 30–545 and 30–573. The Court also notes that all these proposed adult locations sought to locate within 500 feet of residential areas.

With respect to Mayor Randlett's campaign promises, the Court would be remiss were it to elevate statements made by Randlett in the heat of the campaign trail to a "wide-spread custom." Additionally, the task force was organized not as a means of depriving adult business owners of their right of free speech under the first amendment, but as a means of pursuing legal alternatives to limit the number of adult businesses in Warren. In short, although plaintiffs' theory that there was a city-wide conspiracy running from the mayor on down to the lower subordinate building officials to hinder and harass any one disseminating sexually explicit speech makes for good reading, it simply has no foundation in the evidence presented at trial.

(39) Finally, as already indicated, neither Bruggeman, Servitto or Randlett committed an unconstitutional act relevant to 5583. In any event, as already indicated, none was a final policymaker as defined in *Pembaur* and *Proprotnik.* For these reasons, plaintiffs' claims against the City of Warren must fail.

### E. *Damages*

(40) Having determined that defendants did not violate any of plaintiffs' constitutional rights, the issue of damages need not be addressed.

Accordingly, the Court DISMISSES plaintiffs' claims.

IT IS SO ORDERED.